COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

JEANNIE COUTTA, §

Appellant, §

v. §

THE STATE OF TEXAS, §

Appellee. §

§

No. 08-10-00039-CR

Appeal from the

243rd District Court

of El Paso County, Texas

(TC# 20040D01265)

## **O P I N I O N**

A jury found Appellant guilty of one count of aggravated promotion of prostitution (Count I) and three counts of engaging in organized criminal activity (Counts II-IV). The same jury assessed punishment at confinement of ten years for Count I, seventeen years for Count II, two years each for Counts III and IV, and a fine of $10,000 for each count. Appellant appeals her convictions.[1] We affirm.

## **BACKGROUND**

Appellant and her business partner, Phyllis Woodall, owned and operated the Naked Harem, an adult-entertainment establishment where patrons paid a cover charge for admission to be entertained by totally-nude women. For a $1 tip paid to a dancer per song, a patron could sit by one of the stages and watch the dancer on stage perform in the nude. For an additional $10 to $30, a patron could purchase a "table dance" or "lap dance," a term used interchangeably at trial to describe a dance in which the dancer was closer and more intimate with the patron. A patron

---

[1] Appellant's indictment originally included a fourth count of engaging in organized criminal activity (Count V), which the State dismissed during Appellant's first trial. After a jury was unable to reach a unanimous verdict in the first trial as to Counts I-IV, the trial court granted a mistrial. The case before us arises from Appellant's subsequent trial.

could also purchase a private two-song dance in one of four private rooms in the club for $130 cash or $140 if paid by credit card. A patron could purchase additional songs if he wanted more time in the private room.

The dancers were independent contractors who had to pay the club a "floor fee" for the privilege of dancing in the Naked Harem. They were not paid a salary. The dancers kept all of the money that patrons paid for stage and table dances, but they split with the Naked Harem the money earned from private dances. For the two-song minimum private dances, the Naked Harem kept $50 if the patron paid in cash, and kept $60 if the patron paid with a credit card.

The Naked Harem made most of its money from the private dances because the dancers kept all of the money from their stage and table dances and, thus, private dances were the "number one" priority of the club. Appellant and Woodall encouraged dancers to perform more private dances rather than limiting their performances to stage and table dances, and dancers who limited their dances were viewed as being selfish and not making money for the club.

Appellant and Woodall were "hands-on" owners and operators of the Naked Harem, were in control of the club and the entertainment provided therein, performed managerial duties when needed, and made all of the decisions regarding who performed duties at the club, including decisions about the hiring and firing of dancers. They made all of the rules and regulations regarding activities at the club and if the managers had any questions, they were required to obtain "permission" from Appellant and Woodall. Appellant was physically present at the Naked Harem about 85 percent of the time and, upon arriving at the club, would see what needed to be done, perform general upkeep, and obtain updates from the managers about the daily operations which included, among other things, information regarding which dancers were making and

2

producing the most money, "who was doing what," and who was causing trouble. The managers also discussed with Appellant and Woodall the daily ledgers documenting the club's revenues and sources thereof.

Appellant and Woodall had cameras installed throughout the public areas of the club from which they could and did monitor club activities, except those occurring within private rooms. Appellant and Woodall monitored the activities from within the club and from home. Appellant also had recording equipment installed on the club's telephones so that she could record and monitor the phone conversations of employees and dancers to determine whether they were speaking with police.

In addition to Appellant and Woodall, other members of the combination identified in Counts II through IV of Appellant's indictment included Richard Hamm, Jacob Crum, Sandra "Tammy" Zepeda, and Maria Brooks, who were employed as managers at the Naked Harem. These managers were paid a percentage of the club's revenues and had a monetary stake therein.

While Appellant and Woodall handed down an "official" policy that no sex or sexual contact was permitted within the club or the private rooms, the rules enforced by Appellant, Woodall, and the managers were very different. Hamm, who had been employed at the Naked Harem for approximately nine years, testified that signs stating that sex was not permitted were not posted until "after the warrant was issued," and Crum, who had worked at the club for seven years, similarly testified that the signs were posted after the first raids leading to Appellant's prosecution.

Hamm testified that during the table or lap dances performed on the main floor of the Naked Harem, dancers would "grind" on the patron's lap. Crum likewise testified that in performing such dances, the dancer would "grind" totally nude upon the patron, rubbing her

3

genitals against the patron for the patron's sexual excitement. Dancers and patrons testified that the dancers would rub their genitals and breasts on the patron's private parts and allow patrons to touch their breasts, buttocks, and genitalia for the patron's sexual satisfaction.[2] The sexual contact was visible to the club managers and to Appellant and Woodall, who were also able to view the activities within the club through the camera monitors. A video showing Appellant observing a sex show was introduced into evidence.

Hamm and Crum stated that Appellant and Woodall had established the "whole process of prostitution" at the Naked Harem and that the owners and managers were aware that prostitution was occurring in the private rooms of the club. Hamm and Crum testified that they specifically discussed with Appellant and Woodall the prostitution and sex occurring within the private rooms. Crum testified that in one instance, in Appellant's presence, he paid to have sex with two dancers in one of the private rooms and Appellant commented, "[T]hat was great." Crum acknowledged that patrons were paying to have sex in the private rooms and testified that the managers were aware of those activities.

Francisco Javier Cisneros had installed the phone and camera monitoring systems in the Naked Harem. Cisneros testified that he had informed Appellant and Woodall that the dancers and patrons were having sex in the private rooms but Appellant and Woodall would deny it. Cisneros, without informing Appellant and Woodall, placed cameras within the private rooms and recorded the activity occurring therein. Cisneros testified that he never presented the recordings to Appellant and Woodall because he figured the owners didn't want the activity to stop. Cisneros' recordings of activity occurring within the private rooms were introduced into evidence

---

[2] Hamm, Crum, and all of the dancers and patron witnesses called by the State were granted transactional immunity from prosecution.

at trial.[3]  The recordings showed numerous sex acts.

Patron Donald Glines testified that he paid the Naked Harem for sex.  Glines said that when he paid for table or lap dances, the dancers would rub their breasts and genitals on him for his sexual gratification and some would ask if he wanted to go to the private room and have sex.  On many occasions, Glines paid the fee to go to the private rooms and during at least one-half to two-thirds of those occasions, Glines engaged in sexual intercourse with the dancer and would sometimes tip the dancer.  On those occasions when he and the dancer did not have sexual intercourse, the dancer would rub her genitals and breasts against him and he would touch the dancer's breasts and genitals.  David Ruiz testified that he paid for oral sex in the private rooms at the Naked Harem once or twice per year between 2001 and 2003, and had sex whether or not he paid the dancer a tip.  Patron Jesus Garcia visited the Naked Harem about once every three months from 2001 to 2003, and testified that after paying for a table dance, some of the dancers would ask if he wanted to have sex in a private room.  Garcia did pay for sex in the private rooms at the Naked Harem and testified that one of the club's managers, Maria Brooks, would inform him when there were new girls who wanted to go to the private rooms.[4]  The prior testimony of patron Jason Casper was introduced at trial.  Casper testified that he paid both for oral sex and to watch live sex shows in a private room at the Naked Harem.

Sylvia Garcia was a dancer at the Naked Harem and testified that, on many occasions, she had sex with a patron in a private room after he paid his fee for the private dance.  Mary Snyder testified that when she was a dancer at the club, she had sex in a private room with a patron after he had paid his private-dance fee.

---

[3] We address Appellant's challenges to this evidence below.

[4] Maria Brooks was named as a member of the combination in Counts II through IV of Appellant's indictment.

Dancer Lucia Pinedo testified that she was employed as a dancer at the Naked Harem when she was 15 years old. In deposition testimony admitted at trial, Appellant admitted that she and Woodall had hired Pinedo to work at the club, and Hamm testified at trial that Appellant brought Pinedo to him and directed that he put Pineda on stage. Hamm said Pinedo "looked pretty young" and questioned her about her age. Hamm testified that Pinedo's identification showed that she was of legal age but Pinedo testified that she showed her high-school identification card, which does not have her date of birth. Crum, who stated that Pinedo looked like a child and did not look 18 years old, testified that when he discussed his concerns about Pinedo's age with Appellant and Woodall, they told him not to worry. Pinedo danced topless and totally nude during her performances and table and lap dances. She had sex with patrons in the Naked Harem's private rooms and, during the lap and table dances, patrons would touch her breasts, buttocks, and "private parts." When police first "raided" the club, Appellant, Hamm, and Crum destroyed a video recording of Pinedo's stage performance at the Naked Harem.

Deserae Williams Gurrola also danced nude on the stage and topless during lap dances at the Naked Harem when she was 15 years old. During the lap and table dances, Gurrola would sit on and grind the patron's lap. After Gurrola had become popular in the club, manager Sandra "Tammy" Zepeda, grabbed Gurrola, told her to "pretty up," and escorted her to a VIP room where a doctor who was patronizing the club had "bought her out," meaning that he had paid for hours' worth of songs. On that occasion, Gurrola and Zepeda's daughter touched and rubbed each other and utilized sex toys while the patron watched. The doctor, Gurrola, and Zepeda's daughter then watched while another dancer and patron had sex within the same room. Gurrola made approximately $2,000 for the evening and when Appellant and Zepeda paid Gurrola in cash,

6

Appellant informed Gurrola that Gurrola was going to make a lot of money at the Naked Harem. Crum testified that he thought Gurrola's identification resembled her and when he showed the identification to Appellant, Appellant instructed him to allow Gurrola to dance. Gurrola testified that she spoke, acted, and looked like a 15-year-old girl when she was dancing at the Naked Harem and noted that any mature adult would have known the difference between her and an 18 year old.

The jury was presented with other evidence regarding physical signs of sexual activity and prostitution occurring at the Naked Harem. Hamm testified that black lights within the club would often show semen spattered all over the dancer's body and Crum testified that, after exiting the private rooms, male patrons were often seen washing their penises in the men's bathroom sink. The jury heard testimony and saw photographic evidence that used condoms were left in the private rooms, and were presented with testimony that Appellant and Woodall conducted a meeting with the dancers and club employees at which they instructed the dancers that they were not to leave used condoms in the private rooms or else be subject to a $50 fine for failing to clean up. The dancers complied with Appellant and Woodall's instruction at the meeting to flush condoms down the toilet so that police would not find them. Because the flushing of used condoms created plumbing problems at the Naked Harem, Appellant and Woodall had a special trap installed in the sewer lines to catch the condoms. The jury was presented with photographic evidence of the condoms collected in the trap and thrown into a trash receptacle near the trap.

## DISCUSSION

In ten issues, Appellant complains: (1) that she has been denied a meaningful and speedy appeal; (2) that the evidence is insufficient to corroborate accomplice-witness testimony in Counts I through IV of the indictment; (3) that the trial court committed jury-instruction error; (4) that the

7

evidence is legally insufficient to support her convictions for Counts I and II; (5) that the trial court committed harmful error in introducing a video recording; and (6) that the trial court committed reversible error by excluding certain testimony.

**SPEEDY APPEAL**

Appellant asserts that she is entitled to a new trial because her appeal was excessively delayed due to the court reporter's failure to complete preparation of the trial record for appellate purposes in violation of her Fourteenth-Amendment right to a meaningful and speedy appeal, and contends that she has been substantially prejudiced thereby.   We disagree.

The trial record in this case was due to be filed on April 10, 2010, and the filing of the 14-volume reporter's record was completed on April 5, 2011.   Within that time frame, Appellant's counsel zealously pursued the filing of the reporter's record, as noted by the trial court, and we twice ordered the trial court to conduct hearings to determine the status of the record.   In each of those hearings, the trial court's reporter explained under oath her reasons for the delay, which were based upon the reporter's heavy work load and her own medical and health-related issues.   During the first of those hearings, the trial court noted that the reasons for the delay involved the reporter's health issues and the trial court's heavy docket, and that the trial court had attempted to assist by relieving the reporter of some of her duties and by employing a "roving" court reporter.   During the second hearing, the trial court stated that it had changed the reporter's duties to allow her more time to work on preparing the record.   After each hearing, we granted extensions for the filing of the reporter's record, neither of which was met.   On March 2, 2011, the court reporter requested an additional extension of time within which to prepare the record, and on March 8, 2011, Appellant filed a Motion for New Trial Due to the Failure of the Court Reporter to

8

Timely File the Record on Appeal. The following day, we denied Appellant's motion and ordered the trial court to conduct another hearing and take appropriate action to ensure that the record was completed quickly. We also directed that unless the trial court appointed a substitute court reporter, the complete record was due by March 28, 2011, and noted that the court reporter would face possible citation for contempt of court and reporting to the Court Reporter's Certification Board for failure to comply with the deadline. The trial court found that the reporter would be able to meet the deadline and stated that it would take an active role and monitor the completion of the record.

A convicted defendant does not enjoy a Constitutional or Sixth Amendment right to a speedy appeal. *See Phynes v. State*, 828 S.W.2d 1, 2 (Tex.Crim.App. 1992); *see also Rheuark v. Shaw*, 628 F.2d 297, 302 (5th Cir. 1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981); *Sparkman v. State*, 634 S.W.2d 82, 84 (Tex.App.—Tyler 1982, no pet.). Texas, however, statutorily provides a convicted defendant a right of appeal and the appellate process must, therefore, comport with due-process requirements. *See Rheuark.*, 628 F.2d at 302.

No Supreme Court decision holds that excessive delay in a direct appeal denies a criminal appellant due process. *See Reed v. Quarterman*, 504 F.3d 465, 485 (5th Cir. 2007). We are guided, however by the opinions of the Fifth Circuit and the Texas courts. The Fifth Circuit has recognized that a court reporter's excessive delay in preparing the appellate record may deny due process when the delay substantially retards the process of a criminal defendant's appeal. *See Rheuark*, 628 F.2d at 302-303. However, not every delay, even an inordinate one, violates a convicted defendant's due process rights. *Rheuark*, 628 F.2d at 302-303.

In determining whether an appellate delay constitutes a violation of due process, our

inquiry is guided by the four speedy-trial factors set out by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). *See Rheuark*, 628 F.2d at 303; *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994), *cert. denied*, 514 U.S. 1097, 115 S.Ct. 1825, 131 L.Ed.2d 746 (1995). Thus, we consider the length of the delay, the reasons for the delay, Appellant's assertion of his right to a speedy appeal, and the prejudice to appellant caused by the delay. *See Bermea*, 30 F.3d at 1569; *Rheuark*, 628 F.2d at 303 n.8; *Sparkman*, 634 S.W.2d at 84. The prejudice prong has been identified as the most important factor of the test. *See Bermea*, 30 F.3d at 1569; *see also United States v. Antoine*, 906 F.2d 1379, 1382 (9th Cir.), *cert. denied*, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 407 (1990). Our prejudice-factor analysis of the appellate delay focuses on three types of possible prejudice: (1) oppressive incarceration during the pendency of appeal; (2) the convicted defendant's anxiety and concern while awaiting the outcome of the appeal; and (3) impairment of the grounds for appeal or viability of defenses in the event of reversal and retrial. *See Bermea*, 30 F.3d at 1569; *Rheuark*, 628 F.2d at 303 n.8.

The one-year delay of the preparation of the reporter's record, while undesirable, did not substantially retard the appellate process in this case and is not so excessive as to weigh in favor of finding a due-process violation. *Bermea*, 30 F.3d at 1569 (one and one-half year delay in filing reporter's record after convicted defendant filed notice of appeal was not so excessive as to militate strongly in favor of finding a due-process violation); *compare Antoine*, 906 F.2d at 1382 (three-year delay, two years of which was attributable to court reporter's unwillingness or inability to produce the trial record after convicted defendant paid for it, favored the convicted defendant). Moreover, the State recognizes, as do we, that Appellant had no hand in the delay and that responsibility rests almost exclusively with the trial court's reporter. Appellant's appeal was not

10

left to falter, however.   Despite the trial court's "heavy" docket and the court reporter's health and medical issues which form the foundation of the delay, this Court, the trial court, and Appellant's counsel exercised their respective powers throughout the period of delay to compel production of the reporter's record for appeal and, ultimately, it was produced and filed.   *See* TEX. R. APP. P. 35.3(c); *Johnson v. State*, 151 S.W.3d 193, 196 (Tex.Crim.App. 2004) (identifying those steps which an appellate court may take to compel a court reporter to prepare and file the record). Consequently, we do not find that this factor weighs heavily against the State.   *Cf. Zamorano v. State*, 84 S.W.3d 643, 649 (Tex.Crim.App. 2002).   Appellant asserted her desire for a timely appeal after the court reporter filed her second request for extension of time to file the record and thereafter pursued the assertion of her right zealously.

A violation of due process cannot be established without a showing of prejudice to Appellant.   *Bermea*, 30 F.3d at 1569.   Although Appellant is ineligible for an appeal bond and has been incarcerated since her conviction and sentencing, she no longer enjoys a presumption of innocence and has not demonstrated that her convictions or sentences are improper.   Absent a showing that her incarceration is oppressive or unjustified in light of the outcome of her appeal on the merits or subsequent retrial, if any, we are unable to find that Appellant has been subjected to oppressive incarceration pending her appeal.   *See* TEX. CODE CRIM. PROC. ANN. art. 44.04(b) (West 2006); *see also United States v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006) (because a convicted defendant is no longer presumed innocent, it cannot be said that his incarceration pending appeal is oppressive); *Antoine*, 906 F.2d at 1382 (a determination of whether a convicted defendant's "incarceration is unjustified and thus oppressive depends upon the outcome of his appeal on the merits, or subsequent retrial, if any").   It is within reason to state that a convicted

defendant who pursues appellate relief experiences some level of concern and anxiety during the pendency of the appeal and we have no reason to distinguish Appellant in this regard. In fact, Appellant does not discuss the anxiety or concern she has experienced other than making a conclusory statement that she has "suffered immeasurable prejudice." Although some federal courts have recognized that the anxiety factor is not particularly useful or compelling for purposes of due-process analysis, Appellant has neither asserted nor demonstrated that she has suffered a degree of particularized anxiety and concern which differentiates her case from that of another appellant. *See DeLeon*, 444 F.3d at 59; *Antoine*, 906 F.2d at 1382-83. Nor has Appellant alleged or demonstrated that the delay of her appellate proceedings has prejudiced any defense that she may wish to present should the outcome of her appeal on the merits result in a reversal or retrial. Where an appellant fails to show such prejudice, we are unable to speculate that prejudice or impairment to her defense exists. Because we are unable to conclude that Appellant has been prejudiced by the delay in her appellate proceedings, we find the delay did not result in a violation of Appellant's due process rights. Issue One is overruled.

## ACCOMPLICE-WITNESS EVIDENCE AND LEGAL-SUFFICIENCY ISSUES

In Issues Two, Three, Four, and Five, Appellant challenges the sufficiency of non-accomplice evidence to corroborate accomplice-witness evidence. In Issue Six, Appellant complains that the trial court erred when it failed to instruct the jury that certain State's witnesses were accomplice witnesses as a matter of law. In her seventh and eighth issues, Appellant asserts that the evidence was legally insufficient to support her convictions under Counts II and I of the indictment, respectively.

We first review the elements of the charged offenses. The criminal offense of prostitution

12

occurs when a person knowingly offers to engage, agrees to engage, or engages in sexual conduct for a fee. TEX. PENAL CODE ANN. § 43.02(a)(1) (West 2011). "Sexual conduct" includes: (1) deviate sexual intercourse, which includes any contact between the genitals of one person and the mouth or anus of another person; (2) sexual intercourse, which means any penetration of the female sex organ by the male sex organ; and (3) sexual contact, which means any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person. TEX. PENAL CODE ANN. § 43.01(1), (3), (4), (5) (West 2011). Consequently, when a person engages in any form of activity defined as "sexual contact" for a fee, he or she has committed the offense of prostitution. TEX. PENAL CODE ANN. § 43.01(3), § 43.02(a)(1) (West 2011). "Sexual contact" need not be flesh-on-flesh but may occur despite the existence of a cloth or other barrier which prevents or impedes flesh-on-flesh contact. *See Steinbach v. State*, 979 S.W.2d 836, 838-40 (Tex.App.–Austin 1998, pet. ref'd) (internal citations omitted). A person commits the offense of aggravated promotion of prostitution if she knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes. TEX. PENAL CODE ANN. § 43.04(a) (West 2011). In interpreting this language, the Texas Court of Criminal Appeals has defined "prostitution enterprise" as "a plan or design for a venture or undertaking in which two or more persons offer to, agree to, or engage in sexual conduct in return for a fee . . . ." *Taylor v. State*, 548 S.W.2d 723, 723 (Tex.Crim.App. 1977). Aggravated promotion of prostitution is the offense alleged in Count I and is the predicate offense in Count II of Appellant's indictment.

A person who employs or authorizes a child to work in any place of business permitting, requesting, or requiring the child to work nude or topless commits the offense of employment

13

harmful to children.   TEX. PENAL CODE ANN. § 43.251(b)(2) (West 2011).   For purposes of Section 43.251 of the Texas Penal Code, "child" means a person who is younger than 18 years of age.   TEX. PENAL CODE ANN. § 43.251(a)(1) (West 2011).   Employment harmful to children is the predicate offense alleged in Counts III and IV of Appellant's indictment.

A person commits the offense of engaging in organized criminal activity if, with intent to establish, maintain, or participate in a combination or in the profits of a combination, she commits aggravated promotion of prostitution (Count II) or employment harmful to children (Counts III and IV).   TEX. PENAL CODE ANN. § 71.02(a)(3) & (7) (West 2011).   A "'combination' means three or more persons who collaborate in carrying on criminal activities[.]"   TEX. PENAL CODE ANN. § 71.01(a) (West 2011).   Engaging in organized criminal activity is the offense alleged in Counts II, III, and IV of Appellant's indictment.

The mental-state requirement of the offense of engaging in organized criminal activity consists of two parts.   *Hart v. State*, 89 S.W.3d 61, 63 (Tex.Crim.App. 2002).   The first part requires the State to prove the defendant had the requisite culpable mental state to commit the predicate offense.   TEX. PENAL CODE ANN. § 71.02 (West 2011); *Hart*, 89 S.W.3d at 63.   The second part requires that the State prove that the defendant committed the predicate offense with the intent to establish, maintain, participate in, or participate in the profits of a combination and that the members of the combination intended to work together in a continuing course of criminal activity.   TEX. PENAL CODE ANN. § 71.02 (West 2011); *Hart*, 89 S.W.3d at 63; *Dowdle v. State*, 11 S.W.3d 233, 236 (Tex.Crim.App. 2000).   This requires some evidence of an agreement to act together in a continuing course of criminal activity.   *See Renteria v. State*, 199 S.W.3d 499, 504 (Tex.App.–Houston [1st Dist.] 2006, pet. ref'd); *Pardue v. State*, 252 S.W.3d

14

690, 700 (Tex.App.--Texarkana 2008, no pet.).

Circumstantial evidence may be and is often used to prove a person's intent or knowledge as direct evidence of the same may be scarce. *See*, *e.g., Pardue*, 252 S.W.3d at 702. Thus, circumstantial evidence may be used to prove, and a jury may infer from the surrounding facts and circumstances, as here: (1) in support of a finding that she committed the predicate offense of aggravated promotion of prostitution, Appellant's knowledge that prostitution was occurring at the Naked Harem; (2) in support of a finding that she committed the predicate offense of employment harmful to children, Appellant's knowledge that Pinedo and Gurrola were 15-year-old dancers employed to dance topless or nude in the Naked Harem; (3) Appellant's intent to participate in a combination; and (4) the agreement of the combination members to act together in carrying out criminal activities. *See Hart*, 89 S.W.3d at 64; *Armentrout v. State*, 645 S.W.2d 298, 301 (Tex.Crim.App. 1983); *Pardue*, 252 S.W.3d at 701-02; *Ledet v. State*, 177 S.W.3d at 213, 218-19 (Tex.App.–Houston [1st Dist.] 2005, pet. ref'd); *Munoz v. State*, 29 S.W.3d 205, 209 (Tex.App.—Amarillo 2000, no pet.).

A conviction may not be had upon the testimony of an accomplice unless that testimony is corroborated by other non-accomplice witness evidence that tends to connect the defendant to the crime. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). "An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state." *Druery v. State*, 225 S.W.3d 491, 498 (Tex.Crim.App.), *cert. denied*, 552 U.S. 1028, 128 S.Ct. 627, 169 L.Ed.2d 404 (2007); *see also Paredes v. State*, 129 S.W.3d 530, 536 (Tex.Crim.App. 2004). This participation must include an affirmative act in promotion of the commission of the offense with which the defendant is charged. *See Druery*,

15

225 S.W.3d at 498; *Paredes*, 129 S.W.3d at 536. A witness is not an accomplice as a matter of law merely because the witness knew of the offense and did not disclose it, or even if the witness concealed the offense. *See Druery*, 225 S.W.3d at 498.

When the evidence is clear and shows that there is no doubt that a witness is an accomplice as a matter of law, the trial court is required to instruct the jury accordingly. *Smith*, 332 S.W.3d at 439. "A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." *Smith v. State*, 332 S.W.3d 425, 439 (Tex.Crim.App. 2011). Thus, if the participant witness has been charged with the offense or with a lesser-included offense, the trial court should instruct the jury that the witness is an accomplice as a matter of law. *Druery*, 225 S.W.3d at 498. When the evidence is conflicting regarding a witness's status as an accomplice, the trial court may instruct the jury to determine the witness's status as a fact issue. *Smith*, 332 S.W.3d at 439-40. When the evidence is clear and shows that a witness is not an accomplice, the trial court is not required to provide an accomplice-witness instruction. *Smith*, 332 S.W.3d at 440.

An immunity agreement is directly relevant to determining whether a witness is an accomplice as a matter of law. *Jones v. State*, 195 S.W.3d 279, 290 n.12 (Tex.App.–Fort Worth 2006), *aff'd*, 235 S.W.3d 783 (Tex.Crim.App. 2007). However, the grant of transactional immunity to a witness does not automatically render the witness an accomplice as a matter of law. *See Moulton v. State*, 508 S.W.2d 833, 836 (Tex.Crim.App. 1974); *Jester v. State*, 62 S.W.3d 851, 855 (Tex.App.–Texarkana 2001, pet ref'd); *Jarnigan v. State*, 57 S.W.3d 76, 91 (Tex.App.– Houston [14th Dist.] 2001, pet ref'd).

*Jury Charge Error*

16

We commence our analysis by examining Issue Six relating to the alleged jury-charge error. It is undisputed that Richard Hamm and Jacob Crum were clearly accomplices as a matter of law. The issues to be resolved are whether the patron witnesses, dancer witnesses (other than Gurrola), and Cisneros were accomplices as a matter of law and whether the trial court was required to instruct the jury that they were accomplices as a matter of law. Appellant contends that all of these witnesses were accomplices as a matter of law to the charged offenses.

We first determine whether a witness was an accomplice to the distinct offenses alleged in each count of Appellant's indictment. A conviction for aggravated promotion of prostitution as alleged in Count I may be had upon the uncorroborated testimony of a party to the offense. TEX. PENAL CODE ANN. § 43.06(d) (West 2011); *Taylor*, 548 S.W.2d at 723. Consequently, Appellant cannot show that the trial court erred by failing to include accomplice-witness instructions regarding any witness as to Count I. In fact, the trial court erred by failing to exclude Count I from the accomplice-witness instruction submitted regarding Hamm and Crum. This portion of Appellant's sixth issue is overruled.

Although Cisneros was aware of prostitution activities occurring within the private rooms at the Naked Harem, had informed Appellant and Woodall that prostitution was occurring within the private rooms, and surreptitiously recorded the prostitution activities, there is no evidence that Cisneros encouraged prostitution. Nor does the record show or suggest that Cisneros knew that Gurrola was dancing at the Naked Harem or was underage. Moreover, Hamm's destruction of a video showing Pinedo dancing at the club did not render Cisneros an accomplice as a matter of law to Appellant's unlawful hiring of Pinedo to dance topless and nude at the club. *See Druery*, 225 S.W.3d at 498 (a witness is not an accomplice as a matter of law simply because he knew of the

17

offense and did not disclose it, or even if he concealed it). As a result, Appellant has failed to show that Cisneros was susceptible to prosecution for any of the offenses for which Appellant was charged or that Cisneros in any way promoted, assisted, or had any specific intent to aid Appellant in the commission of those offenses. That Cisneros was granted transactional immunity from prosecution for a different offense than that with which Appellant was charged does not transform him into an accomplice witness. *See Moulton*, 508 S.W.2d at 836; *Jester*, 62 S.W.3d at 855; *Jarnigan*, 57 S.W.3d at 91. Consequently, Cisneros was not an accomplice witness as a matter of law to Counts II, III, and IV. *See Druery*, 225 S.W.3d at 498. In fact, because Cisneros was not an accomplice as a matter of law, his testimony could be used to corroborate Hamm's and Crum's accomplice-witness testimony as to these counts. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Appellant has failed to show that Cisneros was an accomplice as a matter of law to any of the offenses for which she was charged and, as a result, has failed to show that the trial court committed error when it did not instruct the jury that Cisneros was an accomplice witness as to Counts II, III, and IV. We overrule these portions of Issue Six.

The underage-dancer witnesses identified in Count III (Pinedo) and Count IV (Gurrola) of Appellant's indictment were not susceptible to prosecution for employment harmful to children and cannot be considered accomplices to Appellant's commission of those offenses. The clear intent of Texas Penal Code, section 43.251, which comprises the employment-harmful-to-children statute, is to prevent the exploitation of children under the age of 18 years in the adult-entertainment industry. TEX. PENAL CODE ANN. § 43.251 (West 2011). Section 43.251 implicitly mandates that a child's "consent" to employment in a sexually-oriented commercial activity or in any place of business permitting, requesting, or requiring a child to work

18

nude or topless is no defense to prosecution thereunder, as the child's consent to such employment is not legally operative. *Cf. Scoggan v. State*, 799 S.W.2d 679, 681 (Tex.Crim.App. 1990); *Tyrone v. State*, 854 S.W.2d 153, 155-56 (Tex.App.–Fort Worth 1993, pet. ref'd) (cases explaining that a child may not provide legally-operative consent to sexual intercourse; because the child may never be an accomplice to the rape of the child, the child-victim's uncorroborated testimony can support a defendant's conviction for statutory rape). Pinedo and Gurrola cannot be accomplices under section 43.251. In fact, their testimony could be used to corroborate Hamm's and Crum's accomplice-witness testimony as to Counts III and IV, respectively. Thus, the trial court did not err when it failed to instruct the jury that Pinedo and Gurrola were accomplices as a matter of law as to Counts III and IV, respectively. We overrule this portion of Issue Six.

Although other non-underage dancers and club patrons who testified at trial acknowledged engaging in acts of prostitution at the Naked Harem, there is no evidence that such prostitution involved either Pinedo or Gurrola, and none of the testimony from those witnesses suggested that they aided, encouraged, or promoted Appellant's hiring or allowing Pinedo or Gurrola to work at the Naked Harem. No evidence suggested that any of the testifying non-underage dancer- or patron-witnesses were susceptible to prosecution for the offenses of employment harmful to children or engaging in organized criminal activity by employment harmful to children. Because Appellant has failed to show that any of these witnesses were accomplices as a matter of law as to Counts III and IV respectively, we overrule this portion of Issue Six.

The State agrees that the dancer- and patron-witnesses were susceptible to prosecution for prostitution but does not concede that prostitution is a lesser-included offense of the offenses of aggravated promotion of prostitution and engaging in organized criminal activity by aggravated

19

promotion of prostitution (Count II). The State does agree, however, that if the dancers and patrons were accomplices as a matter of law, the trial court erred when it failed to instruct the jury regarding Count II, which charged Appellant with engaging in organized criminal activity by aggravated promotion of prostitution. In conducting a harm analysis of a failure to properly provide an accomplice-witness instruction, the Texas Court of Criminal Appeals has instructed that we are to consider the purpose and intended effect of article 38.14. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *see Herron v. State*, 86 S.W.3d 621, 631-32 (Tex.Crim.App. 2002) (the instruction merely informs the jury that accomplice-witness testimony cannot be used absent non-accomplice evidence connecting defendant to the offense, and once it is determined that non-accomplice evidence exists, the instruction's purpose is fulfilled; non-accomplice evidence can render a trial court's failure to instruct harmless by fulfilling the purpose the instruction is designed to serve.); *see also Cocke v. State*, 201 S.W.3d 744, 747 (Tex.Crim.App. 2006), *cert. denied*, 549 U.S. 1287, 127 S.Ct. 1832, 167 L.Ed.2d 332 (2007). Because Appellant failed to object to the trial court's charge or to request any accomplice-witness-as-a-matter-of-law instruction, she must show egregious harm. *See Herron*, 86 S.W.3d at 631-34. Under the egregious harm standard, the omission of an accomplice-witness instruction is generally harmless unless the corroborating non-accomplice evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *See Herron*, 86 S.W.3d at 632, *quoting Saunders v. State*, 817 S.W.2d 688, 692 (Tex.Crim.App. 1991).

When we review the sufficiency of corroborating evidence under article 38.14, we must eliminate from consideration any testimony by an accomplice witness and then examine the remaining evidence to determine whether there is any evidence that tends to connect the defendant

to the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14; *see Malone v. State*, 253 S.W.3d 253, 257 (Tex.Crim.App. 2008). The non-accomplice evidence need not corroborate the accomplice testimony as to every element of the charged offense. *See Joubert v. State*, 235 S.W.3d 729, 731 (Tex.Crim.App. 2007) (no requirement that non-accomplice evidence corroborate defendant's connection to a specific element that elevates an offense from murder to capital murder). Nor must the corroborating evidence by itself prove the defendant's guilt beyond a reasonable doubt. *Malone*, 253 S.W.3d at 257. Rather, all that is required is that some non-accomplice corroborating evidence links the accused in some way to the offense and shows that "rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *See Malone*, 253 S.W.3d at 257, *quoting Hernandez v. State*, 939 S.W.2d 173, 179 (Tex.Crim.App. 1997). In determining the sufficiency of the corroborating evidence, we view the non-accomplice testimony in a light most favorable to the verdict. *Hernandez*, 939 S.W.2d at 179.

The testimony of Hamm, Crum, the dancers, and the patrons is sufficient to establish that the Naked Harem was a "prostitution enterprise." TEX. PENAL CODE ANN. § 43.04(a) (West 2011); *Taylor*, 548 S.W.2d at 723. We also find that the corroborating non-accomplice evidence is sufficient to show that Appellant owned, invested in, financed, controlled, supervised, or managed the prostitution enterprise at the Naked Harem.

In a television interview, Appellant acknowledged owning and operating the Naked Harem along with Woodall and stated that she would do anything to see that the Naked Harem made money. In her deposition, Appellant acknowledged that she and Woodall had personally hired an underage dancer, Pinedo, to work at the Naked Harem. Ledgers detailing the Naked Harem's

21

revenues were found in the trash at Appellant's and Woodall's residence and a police department financial analyst testified that the Naked Harem had processed more than $850,000 in credit-card purchases (excluding cash transactions) at the club between 2001 and 2003. The physical evidence at the Naked Harem, including the video showing Appellant watching dancers perform a sex show on the main stage of the club, the numerous used condoms and condom wrappers found in the private rooms of the club, and the traps that were installed to filter the flushed condoms from the club's sewer lines suggest that Appellant, as an owner and operator of the Naked Harem was aware of the illicit sexual activity occurring there. Cisneros' testimony showed that Appellant and Woodall, if they did not already know, were informed that sex acts were occurring in the Naked Harem, that Appellant was aware of the condoms in the private rooms and of the other objective indicators of prostitution in the club, and that after a police raid, Appellant observed Hamm destroy a video recording of 15-year-old Pinedo dancing on stage at the club. By camera, Appellant monitored activities at the Naked Harem from her office and home and recorded the club's telephones to monitor whether the employees were communicating with police but directed Cisneros not to install cameras in the private rooms to prevent the blackmailing of the patrons who used those rooms.

From this evidence, the jury could have inferred that Appellant was actually aware of and permitted the prostitution to occur at the Naked Harem. When viewed in the light most favorable to the verdict, this non-accomplice evidence tended to connect Appellant to the prostitution enterprise within the Naked Harem in that it tended to show that she owned, invested in, financed, supervised, or managed the Naked Harem where the prostitution was occurring. *See Pardue*, 252 S.W.3d at 701-04 (non-accomplice evidence that the accused managed and operated a game room

where illegal gambling activities occurred and gave instructions to game-room employees was sufficient to corroborate accomplice-witness testimony describing the illegal activities); *see also Williams v. State*, 47 S.W.3d 626, 631 (Tex.App.–Waco 2001, pet. ref'd) (accused's out-of-court statements can be a source of non-accomplice evidence); *Medina v. State*, 7 S.W.3d 633, 642-43 (Tex.Crim.App. 1999), *cert. denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000) (accused's veiled admissions sufficient to connect accused to offense). In light of the corroborating non-accomplice evidence tending to connect Appellant to these offenses, the trial court's error in failing to properly instruct the jury on the accomplice-witness rule was harmless as to Count II. *See Herron*, 86 S.W.3d at 631-34; *Medina,* 7 S.W.3d at 641-43; *Williams*, 47 S.W.3d at 631-32. This portion of Issue Six is overruled.

As to Counts III and IV, wherein Appellant was charged with engaging in organized criminal activity by employment harmful to children, the non-accomplice corroborating testimony of Pinedo and Gurrola that each was underage and dancing nude and topless at the Naked Harem is sufficient to corroborate the testimony of Hamm and Crum. Hamm's and Crum's accomplice testimony was sufficient to establish that Appellant had committed the offense of employment harmful to children. TEX. PENAL CODE ANN. § 43.251(b)(2) (West 2011). The non-accomplice evidence showed that Appellant encouraged underage Gurrola to continue dancing at the Naked Harem because Gurrola was going to make a lot of money. Appellant also admitted hiring Pinedo and was present during the destruction of the video which showed Appellant watching Pinedo working at the Naked Harem. This non-accomplice evidence, when combined with the other non-accomplice evidence connecting Appellant to the ownership, operation, supervision, and management of the Naked Harem, tended to connect Appellant to the

23

offenses set forth in Counts III and IV.  *See Medina*, 7 S.W.3d at 642-43; *Williams*, 47 S.W.3d at 631; *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004) (an attempt to conceal incriminating evidence is probative of wrongful conduct and is a circumstance of guilt).

Because the non-accomplice evidence was ample and more than sufficient to connect Appellant to all of the charged offenses in Counts I through IV, the trial court's error in failing to instruct the jury that any of the complained-of witnesses were accomplices to a particular offense was harmless.  We overrule Issue Six in its entirety.

*Sufficiency of the Corroborating Evidence*

We next address Issues Two, Three, Four, and Five, in which Appellant complains that the non-accomplice evidence was insufficient to corroborate the testimony of Cisneros and the State's dancer- and patron-witnesses as to each respective count in the indictment.

Appellant's second issue challenges the sufficiency of the non-accomplice evidence to corroborate the accomplice-witness testimony regarding Count I.  Again, because a conviction for aggravated promotion of prostitution as charged in Count I may be supported by the uncorroborated testimony of a party to the offense, Appellant's second issue is overruled.  TEX. PENAL CODE ANN. § 43.06(d) (West 2011); *Taylor*, 548 S.W.2d at 723-24.

Issues Three, Four, and Five raise the same sufficiency of non-accomplice evidence challenges regarding Counts II, III, and IV, respectively, as raised in Issue Two.  As we addressed in Issue Six, Appellant's own statements and testimony, the testimony of Pinedo, Gurrola, and Cisneros, and the physical evidence presented at trial, showed her ownership and involvement in and at the Naked Harem, which was shown to be a prostitution enterprise, and tended to connect Appellant to each of the charged offenses in Counts II, III, and IV.  The jury's implicit rejection of

24

Appellant's defensive postures of plausible deniability and ignorance was reasonable in light of the sufficient non-accomplice-witness evidence which permitted the jury to reasonably infer and conclude that Appellant knew of the prostitution activity and intended to work together with co-owner Woodall and the Naked Harem's managers to promote the prostitution activities and the employment of underage topless and nude dancers, Pinedo and Gurrola. Issues Three, Four, and Five are overruled.

*Legal-Sufficiency Challenge*

Issues Seven and Eight challenge the legal sufficiency of the evidence to support Appellant's convictions for engaging in organized criminal activity by aggravated promotion of prostitution (Count II) and aggravated promotion of prostitution (Count I), respectively. We review the legal sufficiency of the evidence to support a conviction in the light most favorable to the verdict, and reverse the conviction only if no rational trier of fact could have found that the State had met its burden of proving each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

As we have determined that the non-accomplice witness evidence was sufficient to connect Appellant to the offenses alleged in Counts I and II of the indictment, we review all of the evidence, including the accomplice-witness testimony of Hamm and Crum and the non-accomplice witnesses, to determine the sufficiency of the evidence to support Appellant's convictions for Counts I and II.

That evidence, including Cisneros' surreptitiously recorded video, demonstrated that numerous dancers were performing acts of prostitution in the private rooms at the Naked Harem, and that the Naked Harem constituted a prostitution enterprise. Appellant and Woodall owned

25

and operated the prostitution enterprise and, although they denied to Cisneros that prostitution was occurring, the collective evidence showed that Appellant knew and had been told about the prostitution, that Appellant viewed prostitution occurring firsthand between Crum and the two dancers whom he paid to have sex, that specific discussions occurred between Appellant, Woodall, Crum, and Hamm about prostitution and sex occurring in the private rooms, and that Appellant and Woodall had established the "whole process" for prostitution to occur within the Naked Harem. Evidence similar to the quality and quantity present in this record has been held sufficient to support the convictions of owner-operators of adult entertainment business for aggravated promotion of prostitution. *See, e.g., Armentrout*, 645 S.W.2d at 299-302; *Ringer v. State*, 577 S.W.2d 711, 713-16 (Tex.Crim.App. 1979); *Taylor*, 548 S.W.2d at 723-25; *Smithwick v. State*, 762 S.W.2d 232, 233-34 (Tex.App.—Austin 1988, pet. ref'd); *Brownwell v. State*, 644 S.W.2d 862, 863-65 (Tex.App.—Tyler 1982, no pet.). We find the evidence is sufficient to permit a jury to infer that Appellant was in the business of promoting prostitution.

With regard to the requirement that the State prove that Appellant committed the predicate offense with the intent to participate in a combination with Woodall and the managers of the Naked Harem, the quality and quantity of the evidence in the record before us has likewise been held sufficient to prove the combination element of the engaging statute. *See Pardue*, 252 S.W.3d at 699-704. Evidence that a defendant was the leader of an organization that functioned as the alleged combination and was involved in planning the organization's activities is sufficient to prove that the defendant encouraged, directed, aided, or attempted to aid in the commission of the predicate offense of the combination and is sufficient to support a conviction for engaging in organized criminal activity. *See Otto v. State*, 95 S.W.3d 282, 284-85 (Tex.Crim.App. 2003).

26

While Appellant emphasizes that there was no evidence of a formal agreement between Appellant, her co-owner Woodall, and managers Hamm, Crum, Zepeda, and Brooks to run a prostitution enterprise, circumstantial evidence may be used to prove the state of mind required to support Appellant's conviction. *See Munoz*, 29 S.W.3d at 209. Such circumstantial evidence may also be used to prove the existence of an agreement to work together in continuing criminal activities. *See Munoz*, 29 S.W.3d at 209; *Hart*, 89 S.W.3d at 64.

Sufficient circumstantial evidence showed that prostitution was occurring at the Naked Harem when Appellant, Woodall, Crum, Hamm, Zepeda, and Brooks were managing and operating the club. From all of the direct and circumstantial evidence of Appellant's knowledge of, and together with the named combination members, promotion of prostitution at the Naked Harem, the jury was rationally justified in rejecting Appellant's claims of ignorance that prostitution was occurring at the club and was not required to accept Appellant's defense. *See Agripino v. State*, 217 S.W.3d 707, 716 (Tex.App.–El Paso 2007, no pet.).

Viewed in a light most favorable to the verdict, we find it was reasonable for the jury to have found beyond a reasonable doubt that Appellant was engaged in the aggravated promotion of prostitution and that Appellant agreed to work in conjunction with Woodall, Crum, Hamm, Zepeda, and Brooks as set forth in the indictment to run a prostitution enterprise. Issues Seven and Eight are overruled.

## ALLEGED TRIAL COURT ERROR

*Admission of Video Evidence*

In Issue Nine, Appellant contends the trial court committed harmful error when it allowed the State to introduce Cisneros' silent video recordings of sexual acts occurring between dancers

and patrons in a private room at the Naked Harem. Appellant specifically contends that she did not "open the door" to the introduction of the video recordings, that the recordings were not relevant and were unfairly prejudicial, and that admission of the video recordings was harmful.

During or prior to her first trial (which resulted in a mistrial), Appellant had filed a "motion in limine" asking that the State approach the bench before mentioning or offering into evidence the surreptitious video recordings of sexual acts occurring at the Naked Harem.[5]

At a pretrial hearing held in advance of Appellant's retrial, the trial court noted that it was granting Appellant's motion to suppress "the electrician video." At a subsequent pretrial hearing, the State indicated its intent to file a motion seeking the trial court's reconsideration of its ruling based on an alleged absence of privacy interest by Appellant in the private rooms of the Naked Harem that were open to the public, but no such motion was filed.

During Appellant's opening statement at the second trial, defense counsel proffered that if acts of prostitution were occurring in the Naked Harem, the dancers were receiving the money directly and Appellant and the club did not enjoy the profits of the prostitution activity. On cross-examination, after Hamm had testified on direct examination about the sexual activity in the private rooms at the Naked Harem as well as Appellant's awareness and knowledge thereof, defense counsel elicited testimony from Hamm that when a patron purchased a two-song dance in a private room, sex was not guaranteed, that the dancers could negotiate additional pricing for sex, and that the club's cut of the two-song minimum fee provided access to the private room. Hamm also testified that Appellant had informed him that the club's attorney had said "that a patron could

---

[5] At the same time, Coutta filed a motion to suppress video and audio recordings seized by law enforcement. The video recording at issue was not seized by law enforcement but was provided directly by Cisneros to the State. Therefore, no Fourth Amendment issue is presented and Appellant's suppression motion is inapplicable to our consideration and analysis of Appellant's ninth issue.

masturbate as long as a dancer wasn't being touched." Defense counsel attempted to elicit testimony from Hamm that the dancers would not be having sex for only $80 of their portion of the private dance fee and that some additional negotiation between the dancer and patron would have occurred when the trial court sustained the State's speculation objection:

> Defense Counsel: I mean, what I'm saying is, if there's 130 or $40.00 [sic] involved, and they're going to get 80 –
>
> .   .   .
>
> --it would seem that there would be some negotiation between them, would it not?
> The State: Object to speculation, Your Honor.
> The Court: Sustained.

The State contended that Appellant had "opened the door" to allow the admission of Cisneros' video recordings of sex acts that occurred in one of the Naked Harem's private rooms into evidence to rebut counsel's implications that the dancers were negotiating and charging extra for sex in the private rooms. Defense counsel countered that because the recordings were silent, it was impossible to determine whether negotiations or payment occurred before or after the dancer and patron entered the private room. The trial court stated that it was inclined to believe that if the video recordings showed no exchange of money, the video records would be relevant to rebut defense counsel's suggestions that the dancers were negotiating additional money for sex, and the court further noted that while the video recordings may fall short of conclusively proving that no further negotiation or exchange of money occurred, absolute proof was unnecessary before the recorded evidence would be relevant in proving the fact.

Defense counsel again raised the possibility that dancers were negotiating extra fees for sex when cross-examining Crum, who testified that he assumed that the dancers and patrons were

29

always having sex in the private rooms, that because he wasn't present in the private rooms, he could not be certain that every encounter resulted in sex, and agreed that some customers complained that they did not get what they expected. Crum also testified that upon cleaning the private rooms, he could tell that the condoms had been used but did not know if the condoms containing semen resulted from sexual contact or from masturbation. Crum explained under cross-examination that Woodall had informed him that a patron could legally masturbate in a private room as long as he was not touching the dancer.

Cisneros testified on direct examination that Appellant and Woodall had asked him to install cameras in all areas of the club except the private rooms and also asked Cisneros to check for hidden cameras in the private rooms that Appellant and Woodall believed police may have installed. Without objection, Cisneros also testified that he had installed a camera in one of the private rooms without being requested to do so by Appellant and Woodall and had made video recordings of activity occurring between dancers and patrons in that room between April 12 and April 16, 2001, as well as other times.

Defense counsel objected when the State offered the Cisneros video recordings into evidence, arguing that the trial court had already ruled the recordings were inadmissible, and that he had not opened the door to admission of the silent recordings through the eliciting of cross-examination testimony about "negotiations" and used condoms. The trial court overruled defense counsel's objections, noting that the "negotiation issue, the condom issue and whether or not sex was the norm . . . are three issues that . . . I think opened the door." The video was admitted into evidence and Cisneros testified that the video showed the dancers and patrons having sex in the private room.

30

We do not disturb a trial court's decision to admit evidence absent an abuse of discretion. *See Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex.Crim.App. 2008); *Winegarner v. State* 235 S.W.3d 787, 790 (Tex.Crim.App. 2007); *Torres v. State*, 71 S.W.3d 758, 760 (Tex.Crim.App. 2002); *Flores v. State*, 299 S.W.3d 843, 856 (Tex.App.–El Paso 2009, pet. ref'd). When the trial court's ruling is within the zone of reasonable disagreement, is reasonably supported by the record, and is correct under any theory of law applicable to the case, it must be upheld. *State v. White*, 306 S.W.3d 753, 757 n.10 (Tex.Crim.App. 2010); *Ramos*, 245 S.W.3d at 418; *Torres*, 71 S.W.3d at 760; *Flores*, 299 S.W.3d at 856. This is true even when the trial court gives the wrong reason for its decision. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990).

Evidence that is otherwise inadmissible may become admissible if a party "opens the door" to such evidence. *Williams v. State*, 301 S.W.3d 675, 687 (Tex.Crim.App. 2009), *cert. denied,* ___ U.S. ___, 130 S.Ct. 3411, 177 L.Ed.2d 326 (2010). Appellant opened the door to the admission of Cisneros' video by her opening statement, in which she proffered a defensive theory that if the dancers were committing prostitution, Appellant and the Naked Harem did not realize profits from that activity because the dancers were receiving the money directly from the patrons. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex.Crim.App. 2008) (defendant's opening statement may open the door to otherwise inadmissible evidence to rebut a defensive theory presented in that opening statement); *see also Gaytan v. State*, 331 S.W.3d 218, 225 (Tex.App.–Austin 2011, pet. ref'd) (if opening statement presents a defensive theory, it opens the door to rebuttal evidence). The video recordings show that no exchange of money occurred between the dancers and patrons in the private room in addition to the patron's up-front payment of the fee to the club to gain admission to the private room, and was directly relevant in rebutting Appellant's defensive theory

proffered during her opening statement. *See also Stewart v. State*, 129 S.W.3d 93, 96 (Tex.Crim.App. 2004) (evidence need only provide small nudge toward proving or disproving a fact).

Appellant also opened the door to the admission of Cisneros' video recordings through her cross-examination of the State's witnesses by suggesting that the dancers were negotiating their own price for sex in the private room in addition to the Naked Harem's fee for the "private dance," and by suggesting that the used condoms and semen in the private room were the result of patrons masturbating in the private room. *See Wells v. State*, 319 S.W.3d 82, 94 (Tex.App.–San Antonio 2010, pet. ref'd); *Houston v. State*, 208 S.W.3d 585, 591 (Tex.App.–Austin 2006, no pet.) (defense counsel's cross-examination of a State's witness that leaves a false impression as to some fact may open the door to admission of otherwise inadmissible evidence to correct the false impression). Appellant's cross-examination created the impression that sex was not the norm when a dancer and a patron entered a private room, that any dancers who were committing acts of prostitution were negotiating and charging extra fees for the activity, and that used condoms and semen that were present in the private rooms were the result of patrons masturbating. Such implications authorized the State to reply by seeking the admission of Cisneros' video recordings which showed no exchange of money between the dancers and patrons in the private room either before, during, or after they had sex, rather than patrons merely masturbating. Appellant's cross-examination of the State's witnesses also elicited speculation about what may have been occurring within the private rooms and opened the door to admit the video recordings for the purpose of showing exactly what was happening between dancers and patrons therein. *See Cameron v. State*, 988 S.W.2d 835, 847 (Tex.App.–San Antonio 1999, pet. ref'd) (defendant's

testimony regarding events regarding car bombing opened the door to admission of video recording showing the car bombing, even though the trial court had previously ruled the recording to be inadmissible). Consequently, Appellant has failed to show that the trial court erred or abused its discretion by determining that she opened the door to the admission of the Cisneros video recordings.

We disagree with Appellant's contention that the video recordings showing sex acts between dancers and patrons were not relevant. Evidence is relevant if it tends to make the existence of any consequential fact more or less probable than it is without the evidence. TEX. R. EVID. 401; *Goldberg v. State*, 95 S.W.3d 345, 366 (Tex.App.–Houston [1st Dist.] 2002, pet. ref'd), *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1436, 158 L.Ed.2d 99 (2004). To be relevant in proving a fact, evidence need not prove the fact but it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence. *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex.Crim.App. 2010), *citing Stewart v. State*, 129 S.W.3d 93, 96 (Tex.Crim.App. 2004).

The video alone need not show that the Naked Harem was a prostitution enterprise before it could be found relevant. *See Stewart*, 129 S.W.3d at 96. Hamm and Crum each testified that dancers and patrons were not permitted to enter private rooms until the patron had paid the required fee. The video recordings about which Appellant complains show, as Cisneros described, dancers and patrons having sex in the private room. The video thus tended to show that the Naked Harem was a prostitution enterprise and was relevant to the charged offenses. *See* TEX. R. EVID. 401; TEX. PENAL CODE ANN. 43.04(a) (West 2011).

Appellant attempts to argue on appeal that probative value of the video recordings were substantially outweighed by a danger of unfair prejudice under Rule 403. TEX. R. EVID. 403.

33

Appellant raised a Rule 403 objection in her motion in limine in her first trial but sought only to have the State approach the bench before mentioning or offering the video recordings in this trial. A motion in limine is a preliminary matter which does not preserve any complaints for appellate review and, to preserve such complaint, a party must object at the time the complained-of evidence is offered at trial. TEX. R. APP. P. 33.1(a); *see Fuller v. State*, 253 S.W.3d 220, 232-33 (Tex.Crim.App. 2008), *cert. denied*, 555 U.S. 1105, 129 S.Ct. 904, 173 L.Ed.2d 120 (2009). Neither when addressing the trial court about whether Appellant had opened the door to admission of the Cisneros video recordings nor when the State offered the video recordings into evidence did Appellant make any timely or specific Rule 403 or unfair-prejudice objections or obtain any rulings thereon from the trial court. TEX. R. APP. P. 33.1(a); *Swain v. State*, 181 S.W.3d 359, 365 (Tex.Crim.App. 2005), *cert. denied*, 549 U.S. 861, 127 S.Ct. 145, 166 L.Ed.2d 106 (2006). Thus, Appellant has failed to preserve this complaint for our review. Moreover, because we find the trial court neither erred nor abused its discretion in admitting the Cisneros video recordings into evidence, we need not conduct a harm analysis. Issue Nine is overruled.

*Exclusion of Testimony*

In Issue Ten, Appellant complains that the trial court erred by excluding the testimony of Michael Gibson. We disagree.

During defense counsel's cross-examination, Hamm testified, without objection, that Appellant had informed him that the attorney for the club had advised that a patron could legally masturbate in a private room if there was no contact between the patron and the dancer. Over the State's objection, defense counsel elicited essentially the same testimony from Crum. Crum later testified on re-direct examination by the State that, in his opinion, condoms were used for sex and

34

not for masturbation.

Before the defense rested, and outside the presence of the jury, Appellant proffered the testimony of attorney Gibson, who testified that he had advised Appellant and Woodall that if a patron masturbated in a private room at the Naked Harem during a private dance, the offense of public lewdness would not have been committed "as long as it was not done for commercial pay." Defense counsel then sought to call Gibson "for the masturbation issue, what he had advised them," but proffered no theory of the relevance of such testimony. Defense counsel did not respond to the trial court's inquiry about how Gibson's "masturbation" testimony was relevant to the charge of prostitution, and the trial court sustained the State's relevancy objection to Gibson's testimony.

On appeal, Appellant contends that Gibson's testimony was relevant because it would have tended to provide a legitimate reason or explanation for the presence of the condom machine at the Naked Harem as well as to why the discovery of used condoms in the private rooms would not have placed Appellant on notice that the dancers and patrons were having sex in the private rooms. According to Appellant, Gibson's testimony was critical to her defensive theory that she lacked knowledge of prostitution in the club and that the exclusion of such testimony both deprived her of her right to present a defense and was harmful.

When a party argues one theory of relevance or admissibility at trial and then argues a different theory of relevance or admissibility on appeal, no error has been preserved. *See Johnson v. State*, 181 S.W.3d 760, 762-63 (Tex.App.–Waco 2005, pet. ref'd) (where defendant argued at trial that excluded evidence was relevant and admissible to show previous relationship between defendant and victim but argued on appeal that the evidence was relevant and admissible to show

35

victim was first aggressor, error was not preserved for appellate review).

Appellant's failure to proffer any theory of relevance or admissibility regarding Gibson's excluded testimony at trial does not afford her the opportunity to do so on appeal. *See Johnson*, 181 S.W.3d at 762-63. As a consequence, Appellant has failed to preserve this issue for our review. Issue Ten is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

GUADALUPE RIVERA, Justice

October 17, 2012

Before McClure, C.J., Rivera, J., and Antcliff, J.

(Publish)

36