**Joyce McMillin STURDIVANT,**
**Appellant**

v.

**The STATE of Texas, Appellee.**

**Nos. 01–12–00089–CR, 01–12–00184–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 14, 2013.

Discretionary Review Granted
Oct. 9, 2013.

John Hurley, Waco, TX, for Appellant.

Guy D. Cox, Attorney at Law, E. Alan Bennett, Sheehy, Lovelace & Mayfield, PC, Waco, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and HUDDLE.

## OPINION

EVELYN V. KEYES, Justice.

A jury convicted appellant, Joyce McMillin Sturdivant, of the first degree felony offenses of murder and attempted capital murder and assessed punishment at thirty years' confinement and fifteen years' confinement, respectively, to run

concurrently.[1] In six issues, appellant contends that (1) and (2) the trial court erred by not instructing the jury that Deborah Dieterich was an accomplice as a matter of law with respect to both of the charged offenses; (3) and (4) the State failed to present sufficient evidence to support her conviction of both offenses; and (5) and (6) the trial court erred in taxing as court costs the amounts paid to the attorneys pro tern for the State, to the State's experts and investigators, to the court-appointed attorneys, and to appellant's experts and investigators.

. We affirm.

## Background

### A. The Prior Assault on Joe Sturdivant

Appellant was married to the complainant, Joe Sturdivant, known as "Big Joe," for approximately forty years.[2] They lived in Robinson, Texas, which is located near Waco,[3] and operated a transmission-repair business, Sturdivant Transmission, together.

In summer of 2007, over a year before the murder of Big Joe, appellant approached Ali Ali Abdula Muhammad ("Doc Muhammad"), a long-time family friend, "about doing harm to [Big Joe]." Appellant told Doc Muhammad that she was "tired of" Big Joe, that he was "so bad" to her,

and that she was "[t]ired of getting beat up." She kept telling Doc Muhammad that she wanted Big Joe killed. Doc Muhammad refused to kill Big Joe, but he had no objection to "whoop[ing] his ass." Doc Muhammad had financial difficulties, and he testified that appellant told him that if he could "slow [Big Joe's] ass down just a little bit," she would pay his delinquent taxes.

Doc Muhammad agreed to this plan, and he enlisted another man, Chris Chatman, to "knock [Big Joe] out." Doc Muhammad spoke with appellant by phone early in the morning on September 27, 2007. She told him that she "had enough" and that Big Joe's abuse of her "went too far." She told Doc Muhammad that she was going to leave the door to the house open and that she was going to put up their noisy dogs so they would not wake Big Joe. She told Doc Muhammad where in the house Big Joe slept so he could pass that information on to Chatman.

Chatman had a gun with him, and when he got out of Doc Muhammad's van, he also took a Gerber knife that had been lying in the van. Doc Muhammad remained in his van. Chatman re-appeared shortly thereafter, "sweating and panting."

Chatman, who was Doc Muhammad's next-door neighbor, testified that Doc Mu-

1. See TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011) (providing that person commits offense of murder if she intentionally or knowingly causes death of individual); id. § 19.03(a)(3) (Vernon Supp.2012) (providing that person commits offense of capital murder if she employs another to commit murder for remuneration or promise of remuneration); id. § 15.01(a) (Vernon 2011) (providing that person commits offense of criminal attempt if, with specific intent to commit offense, she "does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended").

2. We will refer to the complainant and appellant's son from her first marriage, Joe Sullins, Jr., as "Big Joe" and "Little Joe," respectively, as the witnesses did in the underlying trial.

3. The Texas Supreme Court transferred this appeal from the Court of Appeals for the Tenth District of Texas to this Court pursuant to its docket-equalization powers. See TEX. GOV'T CODE ANN. § 73.001 (Vernon 2013) ("The supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer.").

hammad told him about a woman who had an abusive husband and said that "something needed to be done." Around 3:00 or 4:00 a.m. on September 27, 2007, Doc Muhammad picked Chatman up and stopped at a convenience store where he called appellant. Doc Muhammad gave Chatman a gun and a knife and told him that the dogs would be in their pens and that the door would be open. While Chatman was in the master bedroom, Big Joe woke up, saw that Chatman was holding a gun, and "immediately jumped out of the bed and just rushed [Chatman and] grabbed [him]." During the ensuing struggle, Chatman hit Big Joe over the head with the gun. As Chatman fled, he ran past a bathroom and saw appellant inside. She was standing "over the bathtub with her fingers in her ears as if anticipating the gunshot." When Chatman got back in the van, Doc Muhammad asked him "if [he] did it, if [he] killed [Big Joe]." Chatman assumed that Doc Muhammad had wanted him to kill Big Joe.

Robinson Police Department ("RPD") Sergeant G. Hinson testified that he responded to a burglary-in-progress call at the Sturdivant residence early in the morning on September 27, 2007. As he approached the house, which sat a distance from the road, he saw Big Joe driving a vehicle toward him, his face and head "covered in blood." Sergeant Hinson requested that Big Joe go back to the house to wait for medical treatment. During the investigation of the scene, Sergeant Hinson discovered that the screen of one of the windows in a vacant bedroom had been cut. Sergeant Hinson found a Gerber knife beneath the window. Brent Watson, a forensic scientist with the Department of Public Safety, analyzed the DNA found on the knife and testified that neither Doc Muhammad nor Chatman could be excluded as contributors to the DNA profile found on the knife. Officers also inspected

appellant's phone records, which indicated that on the morning of the assault a phone call was made to the Sturdivant house from a payphone at a nearby convenience store.

Sergeant Hinson also spoke with appellant, who told him that she had gone to the bathroom and that while she was in there "somebody hit her in the back of the head knocking her out." He stated that the Sturdivants had at least five or six "pretty noisy" dogs at their house, and he opined that the dogs would have been alerted if an intruder entered the house. Laurie Peterson, a volunteer EMT for the Robinson Fire Department who responded to the 9–1–1 call, agreed that the Sturdivants had "quite a few dogs" and that they were "very hostile." Peterson testified that she observed appellant at the scene, that appellant had no noticeable injuries, and that appellant appeared alert and oriented. Dr. Nathan Forrest, the radiologist who interpreted the CT scan performed on appellant when she was taken to the hospital after the break-in, testified that he saw "no evidence of trauma" on appellant's CT films.

Appellant testified on her own behalf and stated that Big Joe "never laid a hand on [her]." She denied ever telling Doc Muhammad that Big Joe was abusing her, and she denied ever telling him that she wanted Big Joe hurt. With regard to the September 27, 2007 break-in and assault, she stated that she was not aware that anything unusual was going on until Big Joe found her passed out in the bathroom and woke her up.

No one was convicted of this offense. Doc Muhammad and Chatman both testified that they received immunity from prosecution in exchange for their truthful testimony in this proceeding.

## B. The Murder of Joe Sturdivant

Deborah Dieterich used to work for TPS Parts, a company that delivered transmission parts to various auto shops, including Sturdivant Transmission, where she met appellant. During the summer of 2008, a number of months after the 2007 break-in and assault on Big Joe, appellant approached Dieterich about finding someone to murder Big Joe. According to Dieterich, she and appellant were having a conversation and appellant "just asked [her] if [she] knew anybody that could have her husband killed." Dieterich responded that she did not know anyone, but she would ask around. Appellant told her that she did not have any money to pay a hired killer, but she did have jewelry that she could use for payment.

Dieterich first approached Glendell Tate and asked him if he would kill Dieterich's own husband. She later told him that "she had a friend that had a more pressing job that was more important than her husband." Specifically, Dieterich told him that appellant wanted Big Joe killed, and Dieterich pointed Big Joe out to Tate by driving him by Sturdivant Transmission and a local restaurant where Big Joe usually ate lunch. Dieterich showed him some jewelry that she planned to use as payment and told Tate that the jewelry belonged to appellant.

After Tate declined to get involved, Dieterich approached Carlos Garcia and asked him if he knew anyone who could kill Big Joe. Garcia responded that he did, but he would have to consult the man first. Garcia recruited Chris Taylor, and they told Dieterich that they wanted $20,000 to commit the murder. Dieterich relayed this information to appellant, who again stated that she did not have any money but that she did have jewelry. Dieterich asked Garcia if this was acceptable, and, after he consulted with Taylor, he confirmed to Dieterich that they would accept jewelry for payment. Appellant then gave Dieterich a box that had two rings in it. Dieterich identified State's Exhibit 63 as one of the rings that had been in that box.

Dieterich met with Garcia and Taylor and gave them the box. Then, they all drove to Cameron Park in Waco, and Taylor told Dieterich that he wanted appellant to write down exactly "what she wanted done and how she wanted it done to her husband." To Dieterich's knowledge, appellant did not do this, but instead she later asked Dieterich to get the rings back. Appellant stated that "she'd take care of it herself." Dieterich attempted to recover the rings, but she was unsuccessful.[4]

Garcia sold one of the rings to a longtime friend of his, James Bond, for $400 during the summer of 2008. Robinson police officers later tracked the ring down and seized it from Bond. Appellant's son, Joe Sullins Jr. ("Little Joe"), and his wife, Rhonda Rostockyj, both identified the ring as one of appellant's. Although appellant refused to state definitively that the ring was hers, she acknowledged that it looked like one that she had owned.

At some point in time before Big Joe died, appellant asked Dieterich if she would go to a particular H–E–B in Waco and purchase a shower cap for her. Dieterich thought that this was a strange request, but she complied. After she gave appellant the shower cap, appellant stated that she "had all she needed now."

---

4. Billy Chalfant was with Glendell Tate on one occasion when he met with Dieterich, and, during this conversation, he learned that "another lady, [appellant] had already given 25– or $30,000 worth of jewelry to have her husband killed and the people got off with the jewelry and didn't kill her husband." Tate later told Chalfant that Dieterich's "friend" and her husband own a transmission shop.

Dieterich saw appellant at Sturdivant Transmission on October 8, 2008, the day Big Joe died. She testified that appellant appeared "[u]pset like overwhelmed," and when asked by the State to clarify, she responded, "Just like a relief. Like the weight was lifted off of her."

Sergeant Hinson testified that he responded to a 9–1–1 call from the Sturdivant residence on October 8, 2008. He was the second person to arrive at the house, and he had to assist volunteer fire chief G. Groppe in opening the front gate that was blocking the driveway leading to the house. RPD Officer P. Carey, who entered the property behind Sergeant Hinson, went to appellant, who was walking around by the garage, and Sergeant Hinson and Chief Groppe tried to enter the house through the front door, which was locked. Sergeant Hinson and Officer Carey then entered the house through the garage. When Sergeant Hinson entered the master bedroom, he saw Big Joe "laying in the bed in a puddle of blood."

Sergeant Hinson testified that several things about the house struck him as unusual. In the kitchen, two drawers had been pulled out and were blocking the hallway. A table in the master bedroom was turned over, and both the inside and outside sliding doors of the patio in the bedroom were slightly open, but this opening was not large enough for someone to fit through. He found an ice pick stuck in the lock of an interior door and a "meat prong" lying on the floor of the hallway. The room with the ice pick, a vacant bedroom, also had a gun safe, which had a key in the lock, but a pipe wrench was also lying on the floor by the safe. Sergeant Hinson stated that Big Joe was an avid gun collector, and guns were "scattered all through the house." He stated that he did not see any grass on the kitchen or utility room floor.

Officer Carey also testified that he did not see any grass clippings on the utility room floor. He stated that the Sturdivants had at least five dogs that were "very loud and acting very aggressive towards [the officers]." The dogs nipped at the officers' heels, and although the dogs became "a little bit less vocal about [their] presence" after the officers had been at the house for a while, they remained wary the entire time. Officer Carey described appellant's demeanor at the scene as "[n]ot exactly in shock, but cold, detached." She was not tearful. Officer Carey also observed a candle burning in the master bedroom. The wax was almost completely liquefied, and Officer Carey believed that the candle had been burning for a "very long time."

Sergeant Hinson contacted RPD Detective G. Young and told him that they had found Big Joe lying in bed with apparent gunshot wounds to his back and head. Detective Young agreed that the Sturdivants' dogs were aggressive and "very" noisy. Detective Young also testified about the ice pick in the interior door lock, the sets of keys in the gun safe and the pipe wrench lying on the floor in front of the safe, and the scented candle burning in the master bedroom. Detective Young opined that the ice pick "appeared to be staged" because the door involved was an interior door and was "[v]ery easy to get into" and a burglar would have just kicked the door in, instead of trying to pick the lock with an ice pick. He also stated that the drawers that had been opened may have been opened in order to stage a burglary attempt, especially because it did not appear that the drawers had been rifled through. He also stated that it was odd that the patio door in the bedroom was open, given the home invasion that had occurred the previous year. Detective Young noticed a full pot of coffee in the

kitchen—appellant told the officers that her usual custom was to make a pot of coffee for Big Joe before she left for work in the morning—and Big Joe's dentures sitting on the kitchen counter. He believed that Big Joe never got out of bed that morning. When asked to describe appellant's demeanor at the scene, Detective Young stated that he "didn't notice that she was crying, you know, uncontrollably or anything of that nature. [There was n]othing [about her behavior] that just really stood out to me."

RPD Detective M. Noel drove out to the murder scene at the request of Detective Young. He also agreed that the Sturdivants' dogs were "pretty aggressive" and noisy and that, if a stranger had come onto the property, "the dogs would have alerted to their presence." He noticed the full pot of coffee and Big Joe's dentures in the kitchen. He reported being puzzled by both the ice pick in the interior door lock and the pipe wrench lying in front of the gun safe, which had keys in its lock. The last room that Detective Noel entered was the master bedroom, and he "noticed an immediate cooler temperature" in that room, as well as a candle that appeared to have been burning for a while.

Dr. Marc Krouse, the chief deputy medical examiner for Tarrant County, performed Big Joe's autopsy. Dr. Krouse testified that Big Joe died of a gunshot wound to the head and a gunshot wound to the back. The entry wound on Big Joe's back was surrounded by gunpowder stippling, indicating that this shot was fired from a "fairly close distance." He stated that Big Joe's body displayed signs of lividity, indicating that he had lain face down for approximately eight or nine hours before being discovered. Dr. Krouse estimated that Big Joe was probably killed some time in the morning. The State asked Dr. Krouse what effect the signifi-

cantly cooler temperature in the master bedroom would have on the body, and Dr. Krouse responded that it would "slow the onset and disappearance of rigor mortis," but it would have very little effect on lividity, which "would begin to occur significantly by eight or nine hours [after death] anyway."

RPD officers collected the clothes that appellant was wearing on the day of the murder and tested portions of the clothing for the presence of gunshot primer residue. Thomas White, a forensic chemist with the Texas Department of Public Safety crime laboratory, testified that he analyzed the results of these tests. During his testimony, he explained that gunshot primer residue is made up of three elements—lead, barium, and antimony—and escapes from a firearm when that weapon is fired. The residue cools and solidifies very rapidly. While the elements are in their gaseous state, they can combine; thus, gunshot primer residue particles that subsequently settle on a nearby surface can be composed of any combination of these three elements. White testified that a "characteristic" gunshot primer residue particle contains all three elements and that, with very rare exceptions, the only event that creates that particular combination of elements is the discharge of a firearm. An "indicative" particle contains a combination of two of the three elements, such as lead and barium or lead and antimony. Actions other than discharging a firearm can create these element combinations, "[s]o they are indicative of gunshot primer residue, but they're not exclusive to it." White stated that a characteristic particle warrants a conclusion that the "object [tested] either was nearby a weapon when it was discharged or that [the] object touched something with gunshot residue on it."

In this case, the Waco branch of the Department of Public Safety collected testing stubs from both sleeves and both pockets of the jacket that appellant was wearing on the day of the murder. White confirmed the presence of one characteristic and one indicative gunshot residue particle on the left sleeve of the jacket and one indicative particle on the right pocket. These results were "consistent with the jacket having been in immediate proximity of a weapon as [the weapon was] being fired" or having "[c]ontacted a surface with gunshot primer residue particles." White could not state definitively that appellant discharged a firearm on the day of the murder; instead, he could only offer a possible explanation for the particular results.

Tom Bevel, a forensic analyst specializing in crime-scene reconstruction, analyzed the physical evidence, the autopsy report, and the crime scene photographs in this case. He testified, based on the pictures of Big Joe lying in bed, that the pictures were "consistent with him being asleep in bed" when he was shot, with no evidence that the dogs alerted him and woke him up before he was killed. Bevel agreed with the responding officers that parts of the murder scene appeared to have been staged to resemble a burglary. Bevel declined to give the name of who he believed committed the murder, but he did state the "characteristics that fit the physical evidence":

> It is somebody who has access to the residence that the dogs know that would be expected to be able to do such an event without alerting the deceased from his sleep where he has defensive movement or other movements reacting to a gunshot. And that it is the intent of the person doing this to kill this individual.

Several days after the murder, Glendell Tate contacted Detective Young and told him that Dieterich had approached him over the summer, that she was looking for someone to kill Big Joe at appellant's direction, and that she had offered $20,000 worth of jewelry as payment to commit the murder. Tate also told Detective Young that Dieterich later told him that she had hired two men and had given them two rings as payment to kill Big Joe and that appellant "was upset because it had not been done." Detective Young spoke with Garcia and Taylor, who admitted taking the jewelry from Dieterich, "[b]ut they failed to carry out the act."

Linda Key testified that her husband had worked for Sturdivant Transmission. Key developed a friendship with appellant, and she would occasionally stop by the shop and socialize with appellant. Key and appellant often complained about their husbands to one another, and, on one occasion, appellant told her that they needed to "hire a two-for-one hit man." Key at first thought that appellant was joking, but appellant then said that she was being serious. Little Joe agreed that appellant would "come in [to the shop] a lot of times talking about killing" Big Joe. Little Joe also testified that on the day of the murder appellant arrived at work around 10:30 a.m.

Appellant testified that on the morning of the murder she went about her usual routine. She heard Big Joe cough, which usually signaled that he was awake, and she turned on the coffee pot for him and left for work. When she arrived home that evening, she noticed bits of dried grass on the floor of the utility room and kitchen, and she yelled at Big Joe about it, thinking he was working in another part of the house. Appellant walked into their bedroom and noticed Big Joe still lying on the bed. When he did not wake up, she

called 9–1–1 and, at their direction, tried to turn him over, which was when she saw the blood on the bed. She denied murdering Big Joe or speaking to Dieterich about hiring someone to kill Big Joe.

The State indicted appellant for capital murder, alleging that she murdered Big Joe to recover life insurance proceeds, and attempted capital murder. The jury convicted appellant of the lesser-included offense of murder and attempted capital murder, and it assessed punishment at thirty years' confinement and fifteen years' confinement, respectively. The trial court ordered that these sentences run concurrently. The court, which had previously determined that appellant was indigent and required court-appointed counsel, imposed court costs in the amount of $64,538.22 against appellant. This amount included attorney pro tern fees,[5] fees for the State's investigators and experts, court-appointed counsel's attorney's fees, and fees for defense investigators and experts. The trial court included the following special finding in the final judgment:

> The Court finds that the defendant has financial resources that enable her to pay in whole the assessed costs. The Court assesses all court appointed attorney's fees, attorney pro tern fees, expert witness fees, and investigator's fees as costs in this cause and Orders the defendant to pay the same.

Appellant did not file a post-judgment motion objecting to the inclusion of these fees in the costs award. This appeal followed.

### Sufficiency of Evidence

In her second and third issues, appellant contends that the State failed to present sufficient evidence that she committed the offenses of murder and attempted capital murder.

### A. Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim.App.2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim.App.2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim.App.1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex.Crim.App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim. App.2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007) ("When the record supports conflicting in-

---

5. The McLennan County Criminal District Attorney's Office moved to recuse itself on conflict of interest grounds. The trial court appointed an attorney pro tern to act for the State pursuant to Code of Criminal Procedure article 2.07. *See* TEX.CODE CRIM. PROC. ANN. art. 2.07 (Vernon 2005).

ferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

### B.  Murder

█ Appellant was originally indicted for capital murder, but the jury found her guilty of the lesser-included offense of murder. To support this conviction, the State had to establish that appellant intentionally or knowingly caused Big Joe's death by shooting him with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011). Appellant argues on appeal that the evidence was insufficient because the State failed to prove motive or offer a murder weapon into evidence, and the State's gunshot primer residue expert refused to state definitively that appellant fired the weapon that killed Big Joe.

The State presented evidence that in 2007, a year before the murder, appellant complained to Doc Muhammad that Big Joe abused her and "[s]he wanted something done about it." Appellant "kept saying she wanted [Big Joe] killed," but when Doc Muhammad refused to kill Big Joe, they agreed that he and Chris Chatman would "knock him out." Doc Muhammad testified that appellant said, "[I]f you can slow his ass down just a little bit, I'll pay your [delinquent] taxes." Linda Key, whose husband used to work at Sturdivant Transmission, would socialize with appellant while visiting the shop, and she testified that she and appellant would often complain about their husbands. One day, appellant stated to Key that they needed to "hire a two-for-one hit man." Appellant told Key that she "was being serious." Little Joe also testified that appellant would complain about Big Joe and would come into the shop "a lot of times talking about killing him." Although several witnesses, including Little Joe, testified that Big Joe did not abuse appellant, the State

presented evidence that appellant had complained of abuse.

It is the province of the jury to resolve conflicts in the evidence, and we defer to that determination. *See Clayton*, 235 S.W.3d at 778. Thus, contrary to appellant's assertion on appeal that she had no reason to want to harm Big Joe, the State presented evidence that she did have motive, that she had mentioned hiring a hit man and had talked about killing Big Joe on several occasions to a couple of different people, that she had, on a previous occasion, offered to pay two others to assault Big Joe, and that her original plan on that previous occasion was to have Big Joe killed. *See Temple v. State*, 342 S.W.3d 572, 585 (Tex.App.-Houston [14th Dist.] 2010) (noting that although motive is not essential element of crime, "evidence of motive is generally admissible because it is relevant as a circumstance tending to prove guilt"), *aff'd*, 390 S.W.3d 341 (Tex. Crim.App.2013); *see also Rogers v. State*, 183 S.W.3d 853, 864 (Tex.App.-Tyler 2005, no pet.) ("[E]vidence of prior assaults on and threats toward the victim by the defendant is relevant to show the defendant's previous relationship with the victim as well as the defendant's state of mind at the time of the offense."); *Penã v. State*, 864 S.W.2d 147, 150 (Tex.App.-Waco 1993, no pet.) (holding same).

In arguing that the evidence was insufficient, appellant points out that the murder weapon was not recovered and was not entered into evidence. The State, however, correctly argues that the inability to recover the murder weapon does not render the evidence supporting the conviction insufficient. *See Temple*, 342 S.W.3d at 591 (noting that "the State need not connect appellant to a specific murder weapon or ammunition; a conviction may be based entirely on circumstantial evidence"); *Guevara v. State*, 297 S.W.3d 350, 359–60 (Tex.

App.-San Antonio 2009, pet. ref'd) (holding evidence sufficient to support murder conviction even though murder weapon never recovered).

Furthermore, although Thomas White, the State's gunshot-residue expert, would not definitively state that appellant fired the firearm that killed Big Joe, White also testified that one characteristic and one indicative gunshot primer residue particle was confirmed on the left sleeve of appellant's jacket and one indicative gunshot primer residue particle was confirmed on the right pocket of her jacket. White testified that a "characteristic" particle contains all three of the elements of gunshot primer residue—lead, barium, and antimony—and, generally, only the discharge of a firearm creates that specific element combination. An "indicative" particle contains two of the three elements. White testified that these test results were "consistent with the jacket having been in immediate proximity of a weapon as [the weapon was] being fired."

■ Although appellant presented evidence that she, at the direction of the 9–1–1 dispatcher, tried to roll Big Joe's body over and that she often helped Big Joe clean the many firearms they kept around their house, which may have accounted for the presence of gunshot primer residue on her clothing, a reasonable inference from the State's evidence is that appellant had gunshot primer residue on her clothing because she fired the murder weapon. When the record supports conflicting inferences, we presume that the jury resolved the conflict in favor of the verdict, and we defer to this resolution. *See Clayton*, 235 S.W.3d at 778.

Officers testified that physical evidence in the home—such as the ice pick stuck in the lock of an interior door, a meat fork lying on the floor in the hall, and the sets of keys and a pipe wrench located near the gun safe—indicated that the scene had been "staged," suggesting an attempt to make it appear as though burglary was the motive for the murder. *See Temple*, 342 S.W.3d at 588 ("Another circumstance of guilt was testimony and physical evidence that appellant's house was 'staged' to give the impression a burglary occurred."). Officers also testified that the full pot of coffee left warming in the kitchen, the presence of Big Joe's dentures lying out on the kitchen counter, and the manner in which he was lying in bed all suggested that he was shot while he was sleeping. The testimony reflected that the Sturdivants had several dogs that barked loudly at everyone who arrived at the house, but not at appellant. Tom Bevel, the State's forensic analyst, provided his opinion on who committed the murder based on the physical evidence:

> It is somebody who has access to the residence that the dogs know that would be expected to be able to do such an event without alerting the deceased from his sleep where he has defensive movement or other movements reacting to a gunshot. And that it is the intent of the person doing this to kill this individual.

Dr. Krouse testified that Big Joe was likely killed eight or nine hours before he was eventually found around 5:30 p.m., or approximately 8:30 to 9:30 a.m. Little Joe testified that appellant arrived at work around 10:30 a.m. that day. The responding officers also stated that the bedroom in which Big Joe was found was noticeably cooler than the rest of the house, and Dr. Krouse stated that a cooler temperature would "slow the onset and disappearance of rigor mortis." The officers further testified that a scented candle was burning in the bedroom when they arrived, and it appeared that the candle had been burning all day. John Epperson, appellant's neigh-

bor, testified that he did not observe any unusual activity at the Sturdivant's house during that day. This combined evidence leads to the reasonable inference that appellant, who had access to the house and who was familiar to the dogs, killed her husband in the morning, manipulated the scene to appear as though burglary was a motive and to delay the onset of rigor mortis, and left for work. *See Clayton*, 235 S.W.3d at 778 (holding that we defer to jury's resolution of conflicting inferences).

We conclude that, viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that appellant intentionally or knowingly killed Big Joe.

We overrule appellant's second issue.

### C. Attempted Capital Murder

■ A person commits capital murder if the person intentionally or knowingly causes the death of another and the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration. TEX. PENAL CODE ANN. § 19.03(a)(3) (Vernon Supp.2012). A person commits the offense of attempted capital murder if, with the specific intent to commit capital murder, she does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended. *Id.* § 15.01(a) (Vernon 2011) (stating law of criminal attempt); *Santellan v. State*, 939 S.W.2d 155, 162–63 (Tex. Crim.App.1997) (stating same in case of murder in course of attempted kidnapping).

■ The law of criminal attempt "does not require that every act short of actual commission of the offense be accomplished." *Santellan*, 939 S.W.2d at 163; *Sorce v. State*, 736 S.W.2d 851, 857 (Tex.

App.-Houston [14th Dist.] 1987, pet. ref'd) ("The fact that an appellant could have taken further actions without actually committing the offense does not act so as to render his actions nothing more than mere preparation.") (citing *Hackbarth v. State*, 617 S.W.2d 944, 946 (Tex.Crim.App.1981)). "There is necessarily a gray area between conduct that is clearly no more than mere preparation and conduct that constitutes the last proximate act prior to actual commission of the offense." *Come v. State*, 82 S.W.3d 486, 489 (Tex.App.-Austin 2002, no pet.) (citing *McCravy v. State*, 642 S.W.2d 450, 460 (Tex.Crim.App.1982)). Convictions for attempted offenses pursuant to section 15.01 "must necessarily be considered on a case-by-case basis." *Gibbons v. State*, 634 S.W.2d 700, 707 (Tex.Crim.App. 1982).

Appellant argues that the State failed to present sufficient evidence that she committed attempted capital murder because Dieterich testified that Garcia and Taylor wanted the agreement in writing before they killed Big Joe and appellant instructed Dieterich to get her rings back from the men, which indicated that "the parties had not advanced beyond a preparatory stage." We disagree.

In *Doty v. State*, the Court of Criminal Appeals considered the nature of "murder for hire" offenses:

> Murder for remuneration under [Penal Code section] 19.03(a)(3) involves, at a minimum, three individuals: (1) principal, (2) agent, and (3) victim. The interaction of these individuals is very simple. The principal hires the agent to kill the victim. In such a relationship, the [o]nly act required of the principal is the hiring of the agent. Once the employment "contract" is made and consideration passes, there is more than mere preparation. In fact, once such a contract of employment exists, the principal has

completed his role and may be guilty of capital murder or attempted capital murder, depending on the success of his agent.

585 S.W.2d 726, 727–28 (Tex.Crim.App. 1979), *overruled on other grounds by Beets v. State*, 767 S.W.2d 711, 736–37 (Tex. Crim.App.1987) (noting that defendant acting unilaterally can commit "murder for remuneration" and overruling *Doty* to extent that it limited murder for remuneration to situations involving "a minimum of" three actors). The issue in *Doty* was the sufficiency of the allegations in the indictment, and the Court of Criminal Appeals held that because the indictment "allege[d] a contract of employment whereby the victim was to be killed and allege[d] payment by appellant as an act beyond mere preparation," the indictment was sufficient. *Id.* at 728.

Here, Dieterich testified that appellant asked her if she knew anyone who could kill Big Joe. Dieterich first approached Tate, who declined to get involved, and then approached Garcia, who said that he knew someone who might be willing. Garcia spoke with Taylor and they agreed to kill Big Joe for $20,000. When Dieterich reported this to appellant, appellant told Dieterich that she needed to pay with jewelry. Garcia and Taylor confirmed to Dieterich that this was an acceptable method of payment. Appellant then gave Dieterich a box that had two rings inside, and Dieterich passed these rings on to Garcia and Taylor.[6] Garcia and Taylor then insisted that appellant write out instructions on how she wanted Big Joe murdered, which appellant did not do. Approximately one month later, appellant decided to "take care of it herself," and she

asked Dieterich to get the rings back. Garcia did not return the rings.

Dieterich's testimony established that she acted as an intermediary between appellant, Garcia, and Taylor, that Garcia and Taylor initially agreed to kill Big Joe for $20,000, that appellant suggested paying in jewelry instead, and that, when Garcia and Taylor agreed to this method of payment, appellant provided rings as payment for Garcia's and Taylor's future efforts, thus creating an "employment contract" to kill Big Joe. *See Doty*, 585 S.W.2d at 727. Even if Garcia and Taylor never actually intended to kill Big Joe, appellant's role in this scheme was complete once she furnished consideration. *See id.* at 727–28. We conclude that her acts amount to "more than mere preparation."

We hold that, viewing the evidence in the light most favorable to the verdict, the State presented sufficient evidence that appellant committed the offense of attempted capital murder.

We overrule appellant's third issue.

### Accomplice–Witness Instruction

In her first issue, appellant contends that the trial court erred in failing to instruct the jury that Dieterich was an accomplice witness as a matter of law with respect to the attempted capital murder offense. In her sixth issue, appellant contends that the trial court erroneously failed to instruct the jury that Dieterich was an accomplice witness as a matter of law with respect to the murder offense.

### A. *Law Governing Accomplice–Witness Instructions*

▮▮▮ Code of Criminal Procedure article 38.14 provides that a conviction cannot

---

6. Garcia sold one of the rings to James Bond. Robinson Police later recovered the ring from Bond, and several witnesses testified that the ring was appellant's. Appellant refused to state that the ring was hers, but she did acknowledge that the ring looked like one that she had owned.

rest on the testimony of an accomplice "unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). The corroborating evidence need not directly link the accused to the offense or be sufficient in itself to establish guilt; instead, the corroborating evidence need only tend to connect the accused to the crime committed. *Moron v. State*, 779 S.W.2d 399, 401 (Tex.Crim.App.1985). The testimony of one accomplice witness may not be used to corroborate the testimony of another accomplice witness. *Id.* "Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration." *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex.Crim.App.1996). Furthermore, there need only be some non-accomplice evidence tending to connect the defendant to the crime, not to every element of the crime. *Joubert v. State*, 235 S.W.3d 729, 731 (Tex.Crim.App.2007). When determining the sufficiency of the corroborating evidence, we view the non-accomplice evidence in the light most favorable to the verdict. *Coutta v. State*, 385 S.W.3d 641, 657 (Tex.App.-El Paso 2012, no pet.) (citing *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex.Crim.App.1997)).

An accomplice is a person who participates before, during, or after the commission of the offense with the requisite culpable mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex.Crim.App.2011) (citing *Druery v. State*, 225 S.W.3d 491, 498 (Tex.Crim.App.2007)). To be considered an accomplice, the person "must have engaged in an affirmative act that promotes the commission of the offense that the accused committed." *Id.* The witness's complicity with the accused in the commis-

sion of another offense apart from the charged offense does not make the witness's testimony that of an accomplice witness. *Druery*, 225 S.W.3d at 498.

A witness may be considered an accomplice as a matter of law or as a matter of fact, and the evidence in the particular case dictates whether an accomplice-witness instruction is required. *Smith*, 332 S.W.3d at 439 (citing *Cocke v. State*, 201 S.W.3d 744, 747 (Tex.Crim.App. 2006)). When the evidence clearly shows—i.e., there is no doubt—that a witness is an accomplice as a matter of law, the court must instruct the jury accordingly. *Id.; Paredes v. State*, 129 S.W.3d 530, 536 (Tex.Crim.App.2004) ("An accomplice as a matter of law is one who is susceptible to prosecution for the offense with which the accused is charged or a lesser included offense."). When, however, there is doubt as to whether a witness is an accomplice—i.e., the evidence is conflicting—then the court may instruct the jury to determine the witness's accomplice status as a fact issue. *Id.* at 439–40. When the evidence clearly shows that the witness is not an accomplice, then the court is not required to instruct the jury on the accomplice-witness rule at all. *Id.* at 440.

### B. Failure to Instruct for Attempted Capital Murder Offense

The State agrees that Dieterich was an accomplice as a matter of law to the attempted capital murder offense and that the trial court erred in failing to so instruct the jury.

Once we determine that error exists in the charge, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim.App.2005). When, as here, the defendant fails to object or states that she has no objection to the charge, we will not

reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *See id.* at 743–44.

In addressing the purpose of the accomplice-witness instruction, the Court of Criminal Appeals stated:

> The [accomplice-witness] instruction does not say that the jury should be skeptical of accomplice witness testimony. Nor does it provide for the jury to give less weight to such testimony than to other evidence. The instruction merely informs the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice evidence connecting the defendant to the offense. Once it is determined that such non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the factfinder's decision-making. Therefore, non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve.

*Herron v. State,* 86 S.W.3d 621, 632 (Tex. Crim.App.2002). A harmless error analysis in cases involving the omission of an accomplice-witness instruction should take into account the existence and strength of any non-accomplice evidence. *See id.* In determining the strength of a particular item of non-accomplice evidence, we consider (1) its reliability and believability and (2) the strength of its tendency to connect the defendant to the crime. *Id.* The reliability inquiry is satisfied if (1) there is non-accomplice evidence, and (2) there is no rational and articulable basis for disregarding the non-accomplice evidence or finding that it fails to connect the defendant to the offense. *Id.* at 633. "Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.' " *Id.* at 632 (quoting *Saunders v. State,* 817 S.W.2d 688, 692 (Tex.Crim.App.1991)); *see also Casanova v. State,* 383 S.W.3d 530, 534 (Tex.Crim. App.2012) (noting that, when conducting harm analysis in situations in which trial court erroneously failed to give accomplice-witness instruction, reviewing court must consider entire record).

Appellant argues that the non-accomplice evidence was too weak to tend to connect her with the commission of the attempted capital murder offense, and she points to the facts that Garcia and Taylor never actually tried to kill Big Joe and that she did not identify the ring that was recovered from Bond as being hers. Instead, she testified only that the ring looked like one that she had owned. As the State points out, however, the record contains additional evidence tending to connect appellant to the offense.

Both Glendell Tate and Billy Chalfant testified that Dieterich spoke with them about hiring someone to kill Big Joe on appellant's request. Tate, who was the first person Dieterich contacted about the attempted murder, stated that Dieterich discussed payment with him, and, during this discussion, she showed him some jewelry, which she said belonged to appellant. Tate also testified that Dieterich told him that she had hired Garcia and a friend of his to commit the murder and that she had given them jewelry as payment. Chalfant testified that Dieterich told him that "another lady [appellant], [Dieterich's] friend had already given 25– or $30,000 worth of jewelry to have her husband killed and the people got off with the jewelry and didn't kill her husband."

Linda Key testified that she and appellant frequently complained about their

husbands to each other, and, one day, appellant told her that they "need[ed] to hire a two-for-one hit man." Key at first thought that appellant was joking, but then appellant stated that she was being serious. Little Joe stated that appellant would come into the shop "a lot of times talking about killing" Big Joe.

Bond testified that, during the summer of 2008, Garcia, a friend of his, approached him with a ring that he wanted to sell. Bond paid Garcia $400 for this ring, and the ring was later seized by police officers. The only thing that Garcia told Bond about how he acquired the ring was that "he got some free stuff." Little Joe and Rhonda Rosktockyj both later identified the ring as belonging to appellant. Appellant acknowledged that the ring procured from Bond and entered into evidence looked like a ring that she had owned, although she refused to state that it was hers.

The State also presented evidence, through the testimony of Doc Muhammad and Chris Chatman, that appellant had a motive for wanting Big Joe dead—his ongoing abuse of her—and that appellant had tried on a previous occasion a year earlier to hire the men to kill Big Joe. According to Doc Muhammad, appellant approached him and originally asked him if he would kill Big Joe, but, when he expressed his unwillingness to kill, appellant told him that if he could "slow [Big Joe's] ass down just a little bit," she would pay his delinquent taxes. This incident resulted in Chatman's assaulting Big Joe.

The Court of Criminal Appeals has held that "[m]otive and opportunity evidence is insufficient on its own to corroborate ac-

complice-witness testimony, but both may be considered in connection with other evidence that tends to connect the accused to the crime." *Smith*, 332 S.W.3d at 442. The corroborating evidence need not be legally sufficient in itself to establish the defendant's guilt. *Casanova*, 383 S.W.3d at 538. Instead, the corroborating evidence need only tend to connect appellant to the commission of the attempted capital murder offense. *See id.* Here, the State presented evidence of motive in addition to other non-accomplice corroborating evidence that tends to connect appellant to the offense.[7]

Although corroborating evidence may be sufficient to tend to connect the defendant to the offense, it may also be inherently unreliable or unbelievable, such that the failure to give an accomplice-witness instruction results in harm. *Id.* at 539. Here, although appellant challenged the State's evidence, the evidence tending to connect appellant to the attempted capital murder offense was not "insubstantial." *See id.* at 540. A disinterested witness, Linda Key, testified that appellant had mentioned hiring a hit man, and two other witnesses, Little Joe and Doc Muhammad, testified that appellant had expressed her desire to kill Big Joe or have him killed. Appellant had previously solicited Doc Muhammad to kill Big Joe, but she eventually settled on hiring Muhammad and Chatman to "knock [Big Joe] out." Glendell Tate testified that, in addition to asking him if he would kill Big Joe, Dieterich showed him the jewelry that appellant had given her to use as payment; and Billy Chalfant

7. Appellant presented contradictory evidence—namely, her testimony that she never asked Dieterich to hire someone to kill Big Joe and her testimony that Big Joe never abused her and she therefore had no motive to want him dead—but the Court of Criminal Appeals has held that the presence of contradictory evidence "does not translate into a conclusion that there was no evidence that a rational trier of fact could conclude tended to connect the appellant to the offense for purposes of Article 38.14's corroboration requirement." *Casanova v. State*, 383 S.W.3d 530, 538–39 (Tex.Crim.App.2012).

confirmed that Dieterich informed him that she had paid two men with jewelry to commit the murder on appellant's behalf. Officers recovered a ring, purchased by Bond from Garcia, one of the men whom Dieterich had contacted, that witnesses positively identified as belonging to appellant.

■ In conducting an egregious harm analysis, we consider the charge, the arguments of counsel, and any other pertinent matters in addition to the evidence. *See Pena v. State,* 251 S.W.3d 601, 610–11 (Tex.App.-Houston [1st Dist.] 2007 pet. ref'd) (conducting egregious harm analysis when trial court failed give accomplice-witness instruction). It is undisputed that this charge did not contain an accomplice witness instruction. Although the State, during jury argument, urged the jury to convict appellant of attempted capital murder under the law of parties, due to Dieterich's involvement as an intermediary, the State did not, contrary to the situation in *Penã,* affirmatively state that Dieterich's testimony did not require corroboration. *See id.* at 611. Furthermore, also unlike the situation in *Penã,* neither of the attorneys stated during voir dire that the jury could convict appellant solely on the basis of the testimony of one witness, which could mislead the jury into believing that corroboration was not required. *See id.* at 611–12.

Viewing the record in its entirety, we conclude that the corroborating non-accomplice evidence was not "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive," and, therefore, appellant did not suffer egregious harm from the trial court's failure to instruct the jury that Dieterich was an accomplice witness as a matter of law with respect to the attempted capital murder charge. *See Casanova,*

383 S.W.3d at 534; *Pena,* 251 S.W.3d at 612.

We overrule appellant's first issue.

### C. Failure to Instruct for Capital Murder Offense

■ Appellant contends that Dieterich was an accomplice as a matter of law with respect to the capital murder offense because Dieterich testified that appellant asked her to purchase a shower cap for her, and, after Dieterich did so and gave appellant the shower cap, appellant stated that "she had all she needed now."

Dieterich testified that appellant requested that she go to a particular H–E–B store in Waco and purchase a shower cap for her. Although Dieterich thought that this was a strange request, she complied. After Dieterich gave appellant the shower cap, appellant told her that "[s]he had all she needed now." The only indication of when this incident occurred is Dieterich's testimony that it happened at some point in time before Big Joe's murder. There is no indication that a shower cap was used during the murder. Appellant testified that she never asked Dieterich to do anything for her or buy anything for her.

To be considered an accomplice, the individual "must have engaged in an affirmative act that promotes the commission of the offense that the accused committed." *Smith,* 332 S.W.3d at 439. The person must have participated before, during, or after the offense with the requisite culpable mental state. *Id.* Thus, for Dieterich to be an accomplice to the capital murder offense, she must have purchased the shower cap for appellant while intending or knowing that her actions would assist in causing the death of Big Joe for remuneration or the promise of remuneration. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (providing culpable mental state for murder); *id.* § 19.03(a)(3) (providing culpable mental

state for capital murder). The fact that Dieterich was complicit in another offense—the attempted capital murder offense—does not necessarily render her an accomplice to the charged offense of capital murder. *See Druery*, 225 S.W.3d at 498.

To be entitled to an instruction that a witness is an accomplice as a matter of law, the evidence must clearly show that the witness is an accomplice. *Smith*, 332 S.W.3d at 439. Here, the testimony reflects that appellant asked Dieterich to purchase a shower cap for her at some point in time before Big Joe was murdered and Dieterich did so. Then, after she had purchased the shower cap and given it to appellant, appellant stated that she "had all she needed now." There is no indication that Dieterich knew when she purchased the shower cap that appellant was planning to use it during the commission of the offense or that the shower cap was actually used by appellant while committing the offense.

We conclude that the record does not support a conclusion that Dieterich's act of purchasing the shower cap for appellant was undertaken with the requisite culpable mental state for capital murder, and, therefore, Dieterich was not an accomplice with respect to the capital murder offense. We hold that the trial court did not err in failing to instruct the jury that Dieterich was an accomplice as a matter of law on this charge.

We overrule appellant's sixth issue.

## Court Costs

In her fourth issue, appellant contends that the trial court erred in taxing as court costs fees for the attorneys pro tern and the State's expert witnesses and investigators. In her fifth issue, appellant contends that the trial court erred in taxing as court costs fees for her court-appointed counsel and her expert witness and investigator.

### A. Taxing as Court Costs Amounts Paid to Attorneys Pro Tem for State and to State's Experts

Code of Criminal Procedure article 2.07 provides that whenever an attorney for the State is disqualified to act in a case, the trial court may appoint any competent attorney to act as an attorney pro tern and "perform the duties of the office during the . . . disqualification of the attorney for the state." TEX.CODE CRIM. PROC. ANN. art. 2.07(a) (Vernon 2005); *see also id.* art. 2.07(b–1) ("An attorney for the state who is not disqualified to act may request the court to permit him to recuse himself in a case for good cause and upon approval by the court is disqualified."). An attorney pro tem "shall receive compensation in the same amount and manner as an attorney appointed to represent an indigent person." *Id.* art. 2.07(c). The Court of Criminal Appeals has held that article 2.07(c) incorporates the provisions of Code of Criminal Procedure article 26.05, relating to court-appointed defense counsel, that govern the "amount and manner of compensation." *See Busby v. State*, 984 S.W.2d 627, 630 (Tex.Crim.App.1998). Article 26.05 includes provisions governing the services for which a court-appointed attorney may receive compensation and the creation of a fee schedule by each county's courts. *See* TEX.CODE CRIM. PROC. ANN. art. 26.05(a)-(c) (Vernon Supp.2012). Generally, unless the court finds that the defendant has the financial resources to pay, all payments made pursuant to article 26.05 shall be paid from the general fund of the county and "may be included as costs of court." *Id.* art. 26.05(f).

In *Busby*, the Court of Criminal Appeals held that article 2.07(c) "does not authorize inclusion of such payments [to the attorney pro tem] in the costs of court." 984

S.W.2d at 630. The court acknowledged that although article 26.05 "contains provisions for a county to recover payments from a defendant," those provisions "cannot be called amount and manner in which the attorney receives compensation." *Id.* at 630–31. The court also reasoned:

The public policy of having the defendant bear the cost of the defense attorney is a familiar part of our legal system. A public policy of having defendants reimburse the state for the costs of the prosecuting attorney would be a novelty, one which we will not impute to the legislature on such tenuous statutory language as that which the State has presented.

*Id.* at 631. The court therefore concluded that if the legislature had intended to authorize courts to require defendants to pay the fees of attorneys pro tern, "it would do so more explicitly." *Id.*

The State contends that because appellant failed either to object to the trial court's inclusion of the fees for the attorney pro tern and the State's expert witnesses and investigators as court costs or to move for a new trial on this basis, appellant failed to preserve this complaint for appellate review. *See* TEX.R.APP. P. 33.1(a)(1)(A) (generally requiring, to preserve error for appellate review, timely request, objection, or motion stating ground for ruling sought from trial court with sufficient specificity to make court aware of complaint).

In *Busby,* the Court of Criminal Appeals declined to consider any questions regarding whether the defendant waived or failed to preserve his complaint that attorney pro tern fees were not taxable as court costs. 984 S.W.2d at 628 n. 3. The Waco Court of Appeals, in addressing whether the defendant preserved the complaint that the attorney pro tern lacked the authority to act for appellate review, has held that article 2.07 sets out the procedural process for the appointment of an attorney pro tern and that, "[i]f those procedures are not properly followed, the defendant should object. Failure to do so, under Rule 33.1, forfeits the complaint on appeal." *Marbut v. State,* 76 S.W.3d 742, 750 (Tex.App.-Waco 2002, pet. ref'd); *see also Modica v. State,* 151 S.W.3d 716, 721 (Tex.App.-Beaumont 2004, pet. ref'd) ("We find that the provisions of article 2.07(c) fall into that class *of Marin's* rules and procedures that are forfeited if not insisted upon by objection, request, motion, or some other behavior calculated to call its lack of implementation to the attention of the 'system's impartial representative, usually the trial judge.'") (quoting *Marin v. State,* 851 S.W.2d 275, 279 (Tex.Crim.App.1993)); *Stephens v. State,* 978 S.W.2d 728, 730 (Tex.App.-Austin 1998, pet. ref'd) (holding that appellant's failure to object to authority of attorney pro tern to prosecute waived error).

In *Modica,* the Beaumont Court of Appeals, addressing whether the trial court impermissibly enlarged the court costs "on an appeal from a municipal court conviction of a 'fine only' citation offense," held that "[t]he proper assessment of court costs [is] neither a systemic requirement nor a waivable-only right." 151 S.W.3d at 721–22. The court therefore concluded that, because the appellant had "fail[ed] to call the trial court's attention to any alleged improper court costs," she did not preserve that issue for appellate review. *Id.* at 722; *see also Johnson v. State,* 365 S.W.3d 484, 490–91 (Tex.App.-Tyler 2012, no pet.) (holding that objection was necessary to preserve complaint that trial court erred in requiring appellant to reimburse Department of Public Safety for drug lab fee).

When, as here, the trial court states in its written judgment that it is taxing par-

ticular fees as court costs, this alleged error becomes known when the trial court signs the judgment, at which point the defendant has the opportunity to alert the trial court of the error via a post-judgment motion. *See Johnson,* 365 S.W.3d at 491; *see also Pena v. State,* 285 S.W.3d 459, 464 (Tex.Crim.App.2009) ("To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.' This gives the trial judge and opposing counsel an opportunity to correct the error.") (quoting *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App.1992) and citing *Reyna v. State,* 168 S.W.3d 173, 179 (Tex.Crim.App.2005)); *Idowu v. State,* 73 S.W.3d 918, 921 (Tex.Crim.App.2002) ("If a defendant wishes to complain about the appropriateness of (as opposed to the factual basis for) a trial court's restitution order, he must do so in the trial court, and he must do so explicitly.").

Here, appellant complains on appeal about the propriety of taxing the attorney pro tern and the State's expert and investigator fees as court costs against her; she does not challenge the factual basis for or the sufficiency of the evidence supporting the amount of fees taxed as costs. *See Idowu,* 73 S.W.3d at 921. The trial court's written judgment includes the following special finding:

> The Court finds that the defendant has financial resources that enable her to pay in whole the assessed costs. The Court assesses all court appointed attorney's fees, attorney pro tern fees, expert witness fees, and investigator's fees as costs in this cause and Orders the defendant to pay the same.

The trial court assessed a total of $64,538.22 in court costs against appellant in the judgment. Appellant did not file any post-judgment motions complaining to the trial court that taxing of the attorney pro tern fees as court costs was improper.

We conclude that because appellant did not complain to the trial court that it impermissibly taxed the attorney pro tern and State's expert and investigator fees as court costs, she has failed to preserve this complaint for appellate review. *See Modica,* 151 S.W.3d at 722 (holding that "proper assessment of court costs are neither a systemic requirement nor a waivable-only right"); *see also Idowu,* 73 S.W.3d at 921 (requiring defendant to explicitly object in trial court to appropriateness of restitution order); *Johnson,* 365 S.W.3d at 490–91 (holding that objection was required to preserve complaint that trial court erred in requiring defendant to reimburse Department of Public Safety for drug lab fee).

We overrule appellant's fourth issue.

## B. Taxing as Court Costs Amounts Paid to Court–Appointed Attorneys and to Defense Experts

Court-appointed defense counsel is entitled to be paid a reasonable attorney's fee for performing certain statutorily enumerated services, such as "time spent in court making an appearance on behalf of the defendant...." TEX.CODE CRIM. PROC. ANN. art. 26.05(a). Generally, all payments made under article 26.05 shall be paid from the county's general fund. *Id.* art. 26.05(f). However, if the trial court determines that the defendant has financial resources that enable her to offset the cost of legal services provided, either in whole or in part, the court shall order the defendant to pay "as court costs the amount that it finds the defendant is able to pay." *Id.* art. 26.05(g). "Thus the defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety

of ordering reimbursement of costs and fees." *Mayer v. State,* 309 S.W.3d 552, 556 (Tex.Crim.App.2010). No objection is required in the trial court to preserve for appellate review a complaint concerning the sufficiency of evidence to support the determination that the defendant has financial resources and is able to pay. *Id.*

■■ Code of Criminal Procedure article 26.04(p) provides that "[a] defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." Tex.Code Crim. Proc. Ann. art. 26.04(p) (Vernon Supp.2012); *Mayer,* 309 S.W.3d at 557. If the evidence does not demonstrate a change in the defendant's ability to pay fees subsequent to the indigency determination, the trial court errs in including court-appointed attorney's fees and investigator's fees in the court costs. *Watkins v. State,* 333 S.W.3d 771, 781–82 (Tex.App.-Waco 2010, pet. ref'd). "There must be some factual basis in the record illustrating that an accused is capable of paying a legal fee levied under [article] 26.05(g) of the Code of Criminal Procedure." *Barrera v. State,* 291 S.W.3d 515, 518 (Tex. App.-Amarillo 2009, no pet.); *see also Roberts v. State,* 327 S.W.3d 880, 884 (Tex. App.-Beaumont 2010, no pet.) (holding same). We must view the evidence in the light most favorable to the trial court's finding. *See Mayer,* 309 S.W.3d at 557.

Here, on April 20, 2011, the trial court held a hearing on appellant's indigency status. Appellant and Little Joe were involved in civil litigation concerning Big Joe's death and the disposition of his assets. William Johnston, Little Joe's attorney, testified that the inventory filed in the administration of Big Joe's estate estimated the value of the estate at $513,150, with their homestead appraised at $250,000, the property for Sturdivant Transmission at $120,000, and the equipment and inventory of Sturdivant Transmission at $118,000. Johnston stated that Sturdivant Transmission was continuing to operate under appellant's direction. He also acknowledged that all of the property listed in the inventory was community property and that litigation was pending concerning the estate. Specifically, he testified that Little Joe was seeking to impose a constructive trust on Big Joe's share of the property. Johnston stated that appellant had sold the homestead and purchased a new home for $139,950. He also testified that, in a deposition in August 2010, appellant estimated that Sturdivant Transmission was worth around $325,000. Appellant also received $92,000 in life insurance proceeds, and, at the time of the deposition, she still had those proceeds in cash.

Little Joe testified that from October 2008 to January 2010, when he left Strudivant Transmission, the net income of the business was approximately $20,000 to $30,000 per month.

John Malone represented appellant in two civil lawsuits, including a lawsuit concerning the sale of Sturdivant Transmission. Appellant had contracted to sell the business for $275,000, but there was a title dispute with Little Joe over the real property of the business. That suit was stayed pending the outcome of appellant's criminal trial, and Malone testified that while the cloud on the title existed appellant was unable to do anything concerning the property. Malone also testified that the Internal Revenue Service had filed a $133,000 tax lien against Big Joe, which affected any property that he owned and "[made] the valu[ation] of the business problematic." Malone also disputed Little Joe's estimation of the net monthly income of Sturdivant Transmission, noting that appellant had testified in her deposition that, since

2005, the business had generated so little monthly income that she was afraid it would have to file for bankruptcy protection. Malone also testified that Little Joe had purchased the new house for appellant, and, although she had paid him back using the proceeds from the sale of the homestead,[8] title remained in Little Joe's name, and, therefore, she could not borrow against that house. Malone stated that appellant used the life insurance proceeds that she received after big Joe's death "for herself, for [Little] Joe and to keep the business afloat." Malone also stated that appellant had over $35,000 in credit card debt, primarily due to allowing Little Joe to use Sturdivant Transmission credit cards.

At the close of the hearing, the trial court stated,

And we've got the majority of the assets that are tied up in litigation. You know, if someone wanted to waive their litigation, open up some of these assets, I think I'd find that she's not indigent, that she could find the money. But I don't see that happening. And then on top of that, we do have a tax lien.

The court further stated that it had no "direct evidence that there's cash sitting any place," and it noted that "all real estate business interests are tied up in civil lawsuits." The court declared appellant indigent and appointed counsel to represent her. In conclusion, the court stated:

I do want the State's attorney to recognize that any and all court appointed attorney's fees will be assessed as costs and those costs can be recouped through normal proceedings. And so, once this matter is concluded and the civil litigation is concluded, I would direct the State's attorney to—to use all efforts

possible to collect these funds that are going to be expended in the representation of Ms. Sturdivant from any and all sources available. Because there are assets out there, but they're tied up at this point in time. She doesn't have access to them. And so, that leaves me with a dilemma and an unusual dilemma that we don't usually see here at the courthouse in cases. But I do direct the State's attorney to use all efforts possible to collect any and all attorney's fees to be paid in this matter.

In its final judgment, the trial court included the following special finding:

The Court finds that the defendant has financial resources that enable her to pay in whole the assessed costs. The Court assesses all court appointed attorney's fees, attorney pro tem fees, expert witness fees, and investigator's fees as costs in this cause and Orders the defendant to pay the same.

On appeal, appellant argues that "there was no evidence of a change in [her] financial circumstances" such that she is required to pay her court-appointed attorney's fees.

At trial, Malone testified that the dispute concerning the title to the Sturdivant Transmission property had been resolved. The trial court presiding over that case had entered an agreed order that the deed granting title to Little Joe was void and that "title was clear and the title to that property belonged to [appellant]." Joe Tom Cuff, who had appellant's power of attorney, testified that he currently handles the business aspects of Sturdivant Transmission. He stated that the IRS lien

---

**8.** Malone testified that net proceeds from the sale of this house were approximately $230,000. He also stated that appellant spent over $20,000 in improvements to her new house.

had been reduced to $22,000.[9]

Considering the evidence that the balance of the IRS lien had been significantly reduced and that title to the Sturdivant Transmission property was now clear, such that appellant could, at the least, sell her interest in the business and the property, we conclude that the record demonstrates a material change in appellant's financial circumstances and contains some evidence that she could pay a fee imposed under article 26.05. *See Mayer*, 309 S.W.3d at 557; *Watkins*, 333 S.W.3d at 781–82; *Roberts*, 327 S.W.3d at 884; *Barrera*, 291 S.W.3d at 518. We hold that the trial court did not err in requiring appellant to pay, as court costs, the fees of her court-appointed attorneys.

We overrule appellant's fifth issue.

### Conclusion

We affirm the judgment of the trial court. All pending motions are denied as moot.

---

9. On cross-examination, Cuff contradicted himself and testified that the IRS lien was originally $1 million and had been reduced to $500,000 at the time of trial. When considering whether the record contains evidence that the defendant's financial circumstances have materially changed, we view the evidence in the light most favorable to the trial court's finding. *Mayer v. State*, 309 S.W.3d 552, 557 (Tex.Crim.App.2010).