

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-15-00025-CR

CHAUNCEY DEON MCCALLUM                              APPELLANT

V.

THE STATE OF TEXAS                                      STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
TRIAL COURT NO. 1334680D

----------

## MEMORANDUM OPINION[1]

----------

Appellant Chauncey Deon McCallum appeals his conviction for aggravated robbery.[2]  In two points, he contends that the trial court erred by failing to include an accomplice-witness instruction in the jury charge that concerned his guilt and

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. § 29.03(a)(2) (West 2011).

by admitting handguns that a police officer found in a car that appellant was riding in on the day the aggravated robbery occurred.  We affirm.

## Background Facts

In the summer of 2013, Chad Casey and Ashley Rangel, who were friends at that time and later became romantically connected, spent a night together at Chad's mother's apartment in Arlington.  The apartment was located in an area in which narcotics-related crimes are common.  When Chad and Ashley awoke, they drove to get donuts and then returned to the apartment complex.  They began eating the donuts while sitting in Chad's car.

According to Chad's testimony, after he and Ashley had been sitting in the car for several minutes, appellant approached the driver's-side window of the car, called Chad by name, identified himself as Chauncey, and asked whether Chad had seen "Rascal," a man who Chad knew.[3]  Chad told appellant that he did not know where Rascal was.  Appellant asked Chad if he had methamphetamine, and Chad said no.  Appellant then asked Chad if Chad wanted to buy marijuana, and Chad agreed to buy some.  Chad, who testified that he had not interacted

---

[3]Ashley testified that when appellant approached the car, he attempted to engage Chad in a conversation about whether Chad had marijuana to sell and whether Chad had bought marijuana from him in the past.  According to Ashley, Chad expressed at that time that he remembered buying marijuana from appellant.  Ashley did not testify about any conversation that appellant and Chad had concerning Rascal, and she testified that the robber did not identify himself as Chauncey.

with or seen appellant before that time and did not know how appellant knew his name, noticed that appellant had a cross tattoo in the middle of his forehead.

Appellant eventually got in the car and sat behind Ashley in the back seat. According to Chad, appellant asked whether a laptop that was on the driver's-side back seat was for sale, and Ashley said no. Appellant then fired a gun in the car and said that he "want[ed] everything," which Chad took to mean that appellant wanted to rob him.[4] Chad tried to take the gun from appellant, and at that time, Chad went limp and felt a sensation of weakness.[5] Appellant got out of the car, and Chad sped away.

A resident of the apartment complex heard gunshots and called 9-1-1. The resident told a dispatcher that the shooter was a black man wearing a do-rag. She also described the car that the shooter had been near while shooting. The dispatcher sent police and medical personnel to the area.

---

[4]Ashley testified,

> I was talking to Chad and I . . . looked over and I whispered: Do you know him? And he didn't say anything. And then next thing I know . . . Chauncey pulled the pistol out on Chad and held it right here to his side and told him to give him money, dope, phones, laptops, anything, you know, worth value. And Chad was like: What are you doing, man?

[5]Ashley testified that after appellant pointed the gun at Chad, Chad attempted to wrestle the gun out of appellant's hand, but appellant pointed it at her head. She explained that Chad then forced appellant's gun away from her head, at which time appellant grabbed her laptop and shot Chad multiple times.

3

Arlington police officer Elise Bowden responded to the dispatch. She saw a silver car that was in a roadway and was not moving. Chad had driven the car about a quarter of a mile from where the shooting occurred. When Officer Bowden approached the car, she saw Chad in the driver's seat and saw Ashley outside of the car. Officer Bowden saw bullet holes in Chad's body. Chad's "color was changing" and his breathing was unstable; Officer Bowden believed that he was dying. An ambulance arrived and took Chad away to a hospital.[6]

Officer Bowden began asking Ashley questions although Ashley, knowing that she had outstanding warrants, told Officer Bowden that her name was Jessica Young. Ashley said that she did not personally know Chad's shooter but that the shooter was a black male who had a medium muscular build, was wearing dark clothing, had a cross tattoo between his eyes and other facial tattoos, and had used a black automatic gun. In Ashley's purses and on her person, Officer Bowden found illegal drugs and drug paraphernalia. Ashley denied that the drugs or the paraphernalia belonged to her but said that she had gathered them from the back seat of the car.[7] Ashley told Officer Bowden about

---

[6]Although Chad could not recall hearing or feeling gunshots, when he awoke in the hospital, he learned that he had bullet wounds in his chest, stomach, and arm. Chad's last memory before awaking in the hospital was Ashley, while crying, telling him to let her drive. Chad's injuries required multiple surgeries; he stayed in the hospital for twenty days.

[7]At trial, Ashley admitted that the paraphernalia and drugs belonged to her and that she had lied to officers about various matters when they responded to the shooting.

4

some of the events that had occurred before the shooting (but not the events concerning the sale of drugs), and Officer Bowden then arrested Ashley. Another officer took Ashley to a jail, where she revealed her true name.

Police officers recovered .40 caliber bullet casings and fragments from Chad's car,[8] and they found another .40 caliber casing on a grassy area close to where the robbery occurred. Officers saw where the gunshots had damaged and bloodied certain parts of Chad's car.

A few hours after the robbery in Arlington occurred, Irving police officer Garrett Rutledge received a dispatch about a possible robbery at a car wash in Irving. The dispatch said that a black male had possessed a Glock-style handgun and was riding in an orange Crown Victoria. In the course of investigating that possible offense, Officer Rutledge conducted a traffic stop of a car that matched that description and that appellant and a female were occupying. Appellant was wearing a short-sleeved black shirt and black pants. Officer Rutledge smelled marijuana coming from the inside of the car and searched it. Inside the car, he found three handguns: a Beretta, a .40 caliber Glock, and a Hi-Point.

Shawn Wheetley, a detective with the Arlington Police Department, received a call about the aggravated robbery and interviewed Ashley in jail. While in a distraught state, Ashley gave a description of the man who had shot

_____

[8]Chad found some of these items in his car after the police released his car to him.

5

Chad. She stated that he had tattoos on his face, including a cross tattoo, and that he was wearing black pants, a black short-sleeved shirt, and a black do-rag. She also stated that the man had taken her laptop. She did not tell Detective Wheetley that the perpetrator had bought drugs from her or Chad.

Later, after Ashley had spoken to various acquaintances while confined, she told Detective Wheetley that she knew who had robbed her. Detective Wheetley prepared a photo lineup with several similar-looking suspects (he chose black males who had facial tattoos, including some that had cross tattoos), and Ashley identified appellant as the perpetrator.

Chad did not identify appellant through a photo lineup; he stated that he could not do so because the crime had "happened so fast." But Chad told Detective Wheetley how the offense had occurred and said that someone named Chauncey had committed it.[9] Like Ashley, he described Chauncey as having a cross tattoo.

Detective Wheetley interviewed appellant one day after the robbery occurred. Detective Wheetley told appellant that he had been named as Chad's shooter. Appellant admitted that he had been in Arlington on the day of the shooting and stated that he had paid cash for drugs from someone named Chad (who was accompanied by a female who had a laptop), but he did not admit that he had shot or robbed Chad, and he stated that he would not steal a laptop or

---

[9]Chad wrote on the photo lineup that the robber had "said his name was Chancy [sic]."

6

"petty cash." Appellant claimed that there were a "lot of people out there [who] don't like Chad" and that "something else must have happened" to Chad after appellant bought drugs from him. He repeatedly stated that if the police released him from confinement, he could discover who committed the crime. Appellant admitted that when the police arrested him on the day of the robbery, he had possessed drugs and had ridden in a car that had three guns in it.

Lillian Lau, a forensic scientist, examined two bullet casings connected with the robbery and determined that they had been fired from the Glock handgun that Officer Rutledge found in the car that appellant was riding in on the same day that the robbery occurred. Lau based her conclusion on marks that the Glock placed on the casings that no other gun (even another Glock) could have made.

Near the time that the robbery occurred, Jamie Corley, one of appellant's friends, noticed that her cell phone was missing. The night before, Corley had been with appellant. On the day that she noticed that the phone was missing, Corley asked appellant about whether he had taken it, and he said that he had done so but that he had dropped it at an apartment complex in Arlington. The police later located Corley's phone in one of Ashley's purses. Detective Wheetley did not find anything in the course of his investigation indicating that Ashley knew Corley. Ashley told Detective Wheetley that after the robbery occurred, she picked up the phone from Chad's car while thinking that it was his. Corley's phone contained pictures of appellant.

7

A grand jury indicted appellant with committing aggravated robbery against Chad while using a deadly weapon. The indictment included a paragraph alleging that appellant had been previously convicted of two felony offenses. Appellant filed several pretrial motions, chose the jury to assess his punishment if he was convicted, and pled not guilty. Chad and Ashley each identified appellant at trial as the man who had committed the aggravated robbery. After the parties presented evidence, rested, and closed, the trial court tendered a proposed charge on the issue of appellant's guilt, and neither party objected to it. After the court read the charge to the jury and the parties presented closing arguments, the jury found appellant guilty. The jury then received more evidence and arguments concerning appellant's punishment and assessed sixty-five years' confinement.[10] The trial court sentenced appellant accordingly, and he brought this appeal.

## Accomplice-Witness Instruction

In his first point, appellant contends that the trial court erred by failing to include an accomplice-witness instruction in the jury charge because the jury received some evidence showing that Ashley may have been an accomplice. Specifically, Detective Wheetley and Chad each testified that Chad had told Detective Wheetley that he believed that Ashley had set him up for the robbery.

---

[10]Appellant pled true to the indictment's enhancement allegation, and the trial court instructed the jury to find the allegation true. Thus, appellant's range of punishment was confinement from twenty-five years to life. *See* Tex. Penal Code Ann. § 12.42(d) (West Supp. 2015).

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). But when there is error in a jury charge, whether it was preserved determines the degree of harm required for reversal. *Id.* Unpreserved charge error, such as the alleged error here, warrants reversal only when the error results in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). The appropriate inquiry for egregious harm is a fact-specific one that must be performed on a case-by-case basis. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

A conviction "cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005); *Jones v. State*, 195 S.W.3d 279, 289 (Tex. App.—Fort Worth 2006) (op. on reh'g), *aff'd*, 235 S.W.3d 783 (Tex. Crim. App. 2007). An accomplice witness is one who could be prosecuted for the same offense with which the accused is charged. *See Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987). Because the law "requires corroboration of accomplice-witness testimony before a conviction can stand, the jury must be instructed accordingly." *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013). When the evidence presented by the parties

as to the witness's complicity is conflicting or inconclusive, the accomplice-witness instruction must ask the jury to decide whether the witness is an accomplice as a matter of fact and apply the corroboration requirement if it determines that the witness is an accomplice. *See id.*

Under the egregious harm standard, however, the omission of an accomplice-witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Jones*, 195 S.W.3d at 290 (quoting *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)); *see Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012); *Lewis v. State*, 448 S.W.3d 138, 144 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("In assessing the strength of non-accomplice evidence, we examine its reliability or believability and the degree to which it connects the defendant to the crime."), *cert. denied*, 136 S. Ct. 52 (2015); *Coutta v. State*, 385 S.W.3d 641, 657 (Tex. App.—El Paso 2012, no pet.). "Corroborating evidence that is exceedingly weak . . . may call for a conclusion that the failure to give the accomplice-witness instruction resulted in harm regardless of whether the deficiency was objected to." *Casanova*, 383 S.W.3d at 539.

Even assuming, without deciding,[11] that the trial court should have submitted an accomplice-witness instruction on the basis of Chad's bare statement to Detective Wheetley that he believed that Ashley had set him up, we cannot conclude that the omission of the instruction was egregiously harmful.[12] Chad identified appellant at trial as the robber, and soon after the robbery had occurred, Chad said that the robber had identified himself as Chauncey. Chad noticed during the robbery that the perpetrator had a cross tattoo on his forehead, and the evidence shows that appellant has one. When appellant was arrested in Irving on the day of the robbery, the car that he had been riding in contained the gun that was linked to bullet casings found at the apartment complex and in Chad's car. Corley's cell phone, which appellant took from her near the time of the shooting, was later discovered in Ashley's purse after appellant admitted that he had dropped it at an apartment complex in Arlington. The phone contained pictures of appellant. During appellant's interview with Detective Wheetley, he admitted that he had been in Arlington on the day of the robbery and had interacted with someone named Chad and with a female who had a laptop.

---

[11]*See* Tex. R. App. P. 47.1; *Garcia v. State*, No. 11-08-00159-CR, 2010 WL 1713026, at *3 (Tex. App.—Eastland Apr. 29, 2010, pet. ref'd) (mem. op., not designated for publication).

[12]We note that in briefing his first point, appellant analyzes only whether error occurred and does not discuss harm.

This evidence and other non-accomplice evidence in the record is strongly indicative of appellant's guilt and is not so unconvincing as to render the State's overall case for conviction clearly and significantly less persuasive without the alleged accomplice evidence. *See Herron*, 86 S.W.3d at 632; *Lewis*, 448 S.W.3d at 144. Accordingly, we conclude that any error in the trial court's failure to submit an accomplice-witness instruction was not egregiously harmful. *See Almanza*, 686 S.W.2d at 171. We overrule appellant's first point.

**The Admission of the Guns**

In his second point, appellant contends that the trial court erred by admitting the handguns that Officer Rutledge found in the car that appellant had been riding in before his arrest in Irving. Mainly relying on a case from another intermediate appellate court, he contends that the guns were inadmissible because the State did not present evidence that sufficiently linked them to him. *See James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (listing factors that may link a defendant to a firearm to prove possession).

When the State called Officer Rutledge, appellant asked for a hearing outside the jury's presence. The trial court granted that request. During the hearing, appellant contended that any testimony from Officer Rutledge about the guns was inadmissible because it was prejudicial and because the guns could not be adequately connected to appellant, who was in the car's front passenger seat. Appellant's counsel contended, "It wasn't his car. The guns weren't in his

12

possession.  They were in the possession of the owner of the car or the driver of the car, who had care, custody[,] and control of that vehicle."  The trial court overruled appellant's objection to Officer Rutledge's testimony, and Officer Rutledge testified to facts about the guns and ammunition to the jury.

But even before Officer Rutledge began testifying, the jury received, without objection, significant evidence about these guns.  For example, Detective Wheetley testified that Irving police officers released to him "the weapons that had been seized along with some ammunition and some magazines."  The State showed Detective Wheetley exhibits 82-A, 83-A, and 84-A—the guns found by Officer Rutledge—and Wheetley confirmed that those exhibits were "the items that were [released to him] by Irving P.D."  Later, Detective Wheetley testified about whether casings found at the scene were compared to "the guns that were recovered from the Defendant."  He then stated that the "Glock handgun, the Beretta handgun, [and] the Hi-Point handgun" all came from "Irving P.D."  Even later in Detective Wheetley's testimony, the following exchanges occurred on cross-examination by appellant's counsel:

> Q. Okay.  And there were -- were there guns taken from [the car that Officer Rutledge stopped in Irving]?
>
> A. Yeah, there were guns found in that vehicle.
>
> Q. And how many?
>
> A. Three.
>
> . . . .

13

Q. What type of guns were taken out of [the] vehicle?

A. There was a Glock handgun, a Hi-Point handgun[,] and a Beretta handgun.

Finally, in the recorded interview of appellant by Detective Wheetley, they discussed the three guns that had been located in the car that appellant was riding in before his arrest in Irving.

Preservation of error is a systemic requirement that we must review on our own motion. *Reynolds v. State*, 423 S.W.3d 377, 383 (Tex. Crim. App. 2014); *Ratliff v. State*, 320 S.W.3d 857, 860 (Tex. App.—Fort Worth 2010, pet. ref'd). To preserve a complaint concerning the admission of evidence, the defendant must make an objection at the earliest opportunity. *See* Tex. R. App. P. 33.1(a)(1); *Martinez v. State*, 91 S.W.3d 331, 335–36 (Tex. Crim. App. 2002). Thus, an objection to the introduction of physical evidence must be made before a witness gives substantial testimony about it. *Ratliff*, 320 S.W.3d at 861; *see Marini v. State*, 593 S.W.2d 709, 714 (Tex. Crim. App. [Panel Op.] 1980) (holding that a complaint concerning the admission of LSD tablets and marijuana was not preserved because "[a]ssuming there was some objection to this evidence when offered, there was no objection to [a police officer's] testimony about finding the narcotics"); *Tell v. State*, 908 S.W.2d 535, 544 (Tex. App.—Fort Worth 1995, no pet.) ("Because Tell failed to object at the time the ski mask was mentioned and allowed further questions and answers before finally objecting, Tell has waived any error in the admission of the ski mask and Officer Bounds's testimony

14

concerning it."); *see also Williams v. State*, No. 02-11-00196-CR, 2012 WL 5356284, at *5–6 (Tex. App.—Fort Worth Nov. 1, 2012, no pet.) (mem. op., not designated for publication); *King v. State*, No. 02-07-00172-CR, 2008 WL 3918051, at *3 (Tex. App.—Fort Worth Aug. 26, 2008, pet. ref'd) (mem. op., not designated for publication) ("When a party objects to the admission of physical . . . evidence after a police officer has already testified about finding the [evidence] without objection, nothing is presented for review."); *Turner v. State*, 642 S.W.2d 216, 217 (Tex. App.—Houston [14th Dist.] 1982, no pet.) (concluding that a defendant forfeited his argument by waiting to object to the admission of evidence until after a police officer extensively testified about it).

We conclude that as in *Ratliff* and *Tell*, along with the other cases cited above, appellant's failure to object to evidence that described the guns that Officer Rutledge found forfeited any error associated with appellant's later objection to the introduction of the guns and further testimony about them. *See* Tex. R. App. P. 33.1; *Ratliff*, 320 S.W.3d at 861–62; *Tell*, 908 S.W.2d at 544. We overrule appellant's second point.

15

## Conclusion

Having overruled both of appellant's points, we affirm the trial court's judgment.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and SUDDERTH, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 23, 2015